**O'CONNOR et al. v. LUDLAM et al. ***

**PARMLY v. SAME.**

**No. 9.**

Circuit Court of Appeals, Second Circuit.

Aug. 16, 1937.

Samuel J. Rosensohn, of New York City (Abraham Tulin, of New York City, of counsel), for appellants.

Holmes, Rogers & Carpenter, of New York City (Nathan L. Miller, Harold H. Corbin, and Edward J. Bennett, all of New York City, of counsel), for appellees.

Before SWAN, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

SWAN, Circuit Judge.

This is an action for deceit brought against the members of the firm of Haskins & Sells, certified public accountants. Haskins & Sells audited the books and accounts of G. L. Miller & Co., Inc., a Delaware corporation, as of the close of busi-

ness August 31, 1925, and delivered to the corporation a balance sheet purporting to show its financial condition as of that date after giving effect to proposed new financing, namely, the sale of 30,000 shares of preferred stock at par—$3,000,000. This balance sheet was used by the corporation in selling its preferred stock to the public, and Haskins & Sells knew that it was to be so used. The plaintiffs are persons who purchased shares of the preferred stock between October 24, 1925, and June 3, 1926, in reliance upon the balance sheet, which they assert was fraudulently false and misleading. In September, 1926, the corporation was adjudicated bankrupt, its assets were insufficient to pay the allowed claims of creditors, and the plaintiffs lost their investments in their entirety. This action was begun in October, 1928. Jurisdiction of the District Court rests upon diversity of citizenship, and each of the plaintiffs sued on his own behalf for $3,000 or more. Their separate causes of action were tried together for convenience. After a trial lasting thirteen weeks, the jury found a verdict for the defendants. Judgment thereon was entered May 18, 1934. Seventeen of the plaintiffs have appealed. The appellees are the original defendants, excepting Charles S. Ludlam, against whom the action had abated by death. The enormous record on appeal, consisting of more than 4,000 printed pages and several hundred documentary exhibits, was not filed until January, 1936, and the case did not come on for argument until a year later. The errors assigned relate solely to refusals to charge as requested, no exceptions having been taken by the appellants to the charge as given.

G. L. Miller & Co., Inc., was organized under the laws of Delaware in October, 1930. It took over the assets, good will, and liabilities of G. L. Miller & Co., a Florida corporation, and issued therefor 1,000 shares of no par value stock. This was issued to Mr. G. L. Miller, who remained throughout the owner of all the common stock of the corporation, except for qualifying shares issued to employee-directors. The net book value of the assets, exclusive of good will, so taken over was about $7,500 after deducting liabilities. In 1923 the corporation declared a common stock dividend of 100 per cent. Thus there were 2,000 shares outstanding at the time of the proposed new financing

in 1925. The business of the Miller Company consisted in underwriting mortgage bonds on real estate, usually on buildings to be constructed, acting as trustee under the mortgage indentures, and selling the bonds to the public. The common course of business involved three agreements: An underwriting agreement under which Miller & Co. purchased the mortgagor's bonds; a trust indenture, under which Miller & Co. as trustee was to receive from the mortgagor in equal monthly installments sums sufficient to enable it to pay semiannually to the bondholders the yearly interest, the federal income tax thereon (up to 4 per cent.), and the amount required for annual redemption of the bonds, which matured serially; and a disbursing agreement, under which Miller & Co. agreed to advance the amount of the mortgage loan as construction progressed. For the money thus advanced Miller & Co. depended upon the sale of the mortgage bonds.

At the time of the audit in question Miller & Co. had received from mortgagors for interest, income tax, and bond-redemption payments due under the trust indentures funds totalling approximately $1,377,000. These were held by it as trustee for the bondholders, but were commingled with its own cash, and the audit is claimed to be intentionally fraudulent in not adequately disclosing the amount of cash held in trust. Another ground of attack relates to payments made by Miller & Co. to complete the construction of mortgaged buildings. In selling bonds Miller & Co. represented that the mortgagor had agreed to provide the money necessary to complete the building under construction, and had furnished a surety bond guaranteeing completion free of all liens prior to that of the mortgage indenture. In fact, surety bonds were not furnished, and frequently the mortgagor defaulted in completing the structure. To make good such defaults Miller & Co. advanced very large sums out of its own funds. These were represented by notes of affiliates or subsidiaries of Miller & Co. and were shown in the audit as "secured," although, as the District Judge charged, they were not secured. Furthermore, in numerous instances Miller & Co. had itself guaranteed to bondholders completion of the buildings under construction, and the audit made no mention of such contingent liabilities running into

many millions of dollars. It is also charged that the defendants made a false certificate as to the net earnings of Miller & Co. for the year 1924 and the first eight months of 1925. The audit is printed in the margin.[1]

The specific items which are challenged will be referred to hereafter in discussing the alleged errors of the court in refusing to charge as requested.

The charge which Judge Patterson delivered to the jury was an exceptionally clear exposition of the applicable law. Since there was no contractual relationship between the plaintiffs and the defendants, liability could be imposed only for fraud; a mistake in the balance sheet, even if it were the result of negligence, could not be the basis of a recovery. Ultramares Corp. v. Touche, Niven & Co., 255 N.Y. 170, 174 N.E. 441, 74 A.L.R. 1139. Fraud presupposes not only an untrue statement but also a fraudulent intent. On the question of falsity of the representations the jury was told that the issue was whether the defendants' representations, "in the sense to be taken by an ordinary reasonable man," were, in fact, true or untrue—whether a true or a false impression was created. On the question of intent, the jury was told that fraud may be established by showing that a false representation has been made, either

---

[1] G. L. MILLER & CO.
Incorporated

General Balance Sheet, August 31, 1925
After Giving Effect to Proposed New Financing

ASSETS

Cash, Including Time Certificates of Deposit....................................$4,663,099.93
Temporary Investments in Outside Securities:
 Free Securities ........ $335,861.38
 In Escrow ............. 131,038.44

 Total temporary investments in outside securities......................... 466,899.82
Bonds Secured by First Mortgages on Real Estate............................ 7,621,918.92
Notes and Accounts Receivable and Accrued Interest—Secured................. 2,987,411.69
Deferred Debit Items ...................................................... 162,126.42
Furniture and Fixtures, Less Reserve for Depreciation...................... 52,038.30
Good-Will ................................................................ 1.00

 Total...............$15,953,496.08

LIABILITIES

Due to Mortgagors—For Bonds Underwritten—Payable as Construction Progresses $8,757,379.86
Accounts Payable and Sundry Accruals....................................... 88,258.24
Customers' Partial Payments .............................................. 124,099.69
Funds for Bond Interest and Redemption.................................... 1,966,938.40
Deferred Credits to Income .............................................. 234,624.80
Reserves:
 Bond issue expenses .......................................$116,576 82
 Taxes .................................................... 171,894.43
 General .................................................. 30,000.00

 Total reserves .............................................. 318,471.25
Capital and Surplus:
 Preferred capital stock, 8% cumulative participating (authorized and to be issued 30,000 shares of $100.00 each)........$3,000,000.00
 Common capital stock (authorized 5,000 shares of no par value; issued 2,000 shares) .................................. 200,000.00
 Surplus ................................................. 1,263,723.84

 Total Capital and Surplus ................................... 4,463,723.84

 Total .................................................$15,953,496.08

Note: The Company carries life insurance on the life of Mr. G. L. Miller, President, for $500,000.00.

Our audit of the books and accounts of the G. L. Miller & Company, Incorporated, discloses that the net earnings of the Company for the year ended December 31, 1924, were in excess of 2½ times the dividend requirements of the contemplated issue of 30,000 shares of 8% cumulative preferred stock, and that the net earnings for the eight months ended August 31, 1925, were in excess of 3 times the dividend requirements of said stock for the said eight months.

New York, September 30, 1925. HASKINS & SELLS
 Certified Public Accountants.

knowingly, or without belief in its truth, or in reckless disregard of whether it be true or false; and that the issue was whether the defendants had an honest belief that the statements made by them were true. "If they did have that honest belief, whether reasonably or unreasonably, they are not liable. If they did not have an honest belief in the truth of their statements, then they are liable, so far as this third element [scienter] is concerned." The jury was also told that an intent to deceive may be inferred from a lack of honest representation; and that, so far as alleged concealments or omissions were concerned, the issue was whether the omission to state certain matters was deliberate and intended to conceal. It was further charged that, if the audit made "was so superficial as to be only a pretended audit and not a real audit, then the element of knowledge of falsity of their representations is present, and they may be held liable." Reading the charge as a whole, it seems to be in strict conformity with the established law. Ultramares Corp. v. Touche, Niven & Co., 255 N.Y. 170, 174 N.E. 441, 74 A.L.R. 1139; Knickerbocker Merchandising Co. v. United States, 13 F.(2d) 544 (C.C.A.2); Fidelity & Deposit Co. v. Drovers' State Bank, 15 F.(2d) 306 (C.C.A.8); Panther Rubber Mfg. Co. v. Commissioner of Int. Rev., 45 F.(2d) 314 (C.C.A.1). And apparently the plaintiffs themselves thought it accurate and satisfactory at the time, for in response to the court's invitation to state exceptions to the charge as delivered, counsel replied that he had none. However, both sides had previously handed to the court requested instructions, and at the conclusion of the charge Judge Patterson remarked that many of the requests had been given in substance and that, to the extent not thus covered, the requests were refused and an exception granted in each instance. The requests handed up by the appellants numbered 82; and their assignments of error involve 40 alleged refusals to charge as requested, although they had failed to point out any errors in the charge as given. A similar grant of blanket exceptions has been criticized for the burden it passes to an appellate court. People v. Katz, 209 N.Y. 311, 103 N.E. 305, Ann. Cas.1915A, 501. In the federal courts the doctrine is firmly established that exceptions should be specifically taken so that the trial judge may have an opportunity to reconsider the matter and remove the ground of exception. Where the exceptions are not specific, an appellate court is under no duty laboriously to relate each of the requested instructions to the charge as given, in order to determine that no error was committed. American Sugar Refining Co. v. Nassif, 45 F.(2d) 321, 326 (C.C.A.1) and authorities there cited. Nevertheless, if a refused instruction constituted plain error and had resulted in a miscarriage of justice, we should hesitate to ignore it because exceptions were taken as they were in the case at bar. Accordingly, we have examined all of the errors assigned, but we shall discuss only those relating to requested instructions which appear to be the most significant.

*The Subject of Trust Funds:* The first item of assets on the general balance sheet is "Cash, Including Time Certificates of Deposit ...... $4,663,099.93." This figure was obtained by adding to the actual cash the estimated proceeds from sale of the new preferred stock. The actual cash included $1,477,000 of trust funds which Miller & Co. as trustee had received from mortgagors on account of payments due under trust indentures. Miller & Co. was itself the beneficiary of $100,000 of these trust funds, but the remainder, $1,377,000, was held in trust for other bondholders. The inclusion of this sum as a general cash asset of the company without further explanation would plainly give a false impression as to the company's cash position. The main defense against this charge was the defendants' contention that an adequate explanation was supplied by the item on the liability side of the balance sheet, "Funds for Bond Interest and Redemption ...... $1,966,938.40." In round figures this sum represented the aforesaid amount of $1,477,000 actually received from mortgagors plus an amount of $489,000 which was accrued and treated on the company's books as received, although in fact it had not been. The defendants point out that the word "Funds" necessarily meant trust funds, since the "Bond Interest and Redemption" referred to could relate only to bonds on mortgaged property, Miller & Co. having no bond issue of its own. On the question whether there was ambiguity in this item, there was testimony both ways and the judge so charged, after calling the jury's attention to the respective contentions of the parties. He had previously stated that the sum of about $1,400,000.00 was re-

ceived by Miller & Co. as trustee under the mortgages.

 The appellants complain because their requested instructions numbered 25 to 31, inclusive, were not given. They urge that the jury was simply left with the conflicting contentions of counsel on the subject of trust funds. In substance, their complaint seems to be that the court did not point out with particularity how to apply to this subject the general rules he laid down for determining whether representations were false and made with fraudulent intent. Such a complaint is not well taken. The judge was under no obligation to discuss in detail the evidence relating to each item of the alleged misrepresentations, and particularly is this true where no request was made to amplify the charge as given. Request No. 25 was to the effect that cash received as trustee can form no part of the company's assets. It is incredible that the jury did not so understand. The court had charged that about $1,400,000 was held in trust, and the issues between the parties, as shown by the court's statement of their respective claims and the general charge, was whether the balance sheet disclosed this trust obligation to the ordinary reader, and whether the accountants could honestly believe that it did. Several of the requested instructions, for example, No. 28, assumed that the balance sheet concealed the true financial condition by failure to disclose the trust. This was for the jury to decide, and such requests were properly refused. Request No. 26 asserted that it was the duty of Haskins & Sells to show clearly on the balance sheet that these trust funds did not belong to Miller & Co. As a principle of correct accounting we should suppose this to be true, but the issue for the jury was not that, but was whether a false impression of financial worth was intentionally created. Request No. 31 asserted that prospective investors in the preferred stock were entitled to know whether Miller & Co. had been guilty of breach of trust and that "the misuse of trust funds is the normal incident of a hopeless financial condition." The inclusion of the final sentence, above quoted, was enough to justify refusal of the instruction in the form presented. We think the charge as given was adequate on the subject of trust funds and no prejudicial error occurred in the refusal of requested charges on this subject.

*The Subject of Secured Notes:* The fourth item of assets in the balance sheet is "Notes and Accounts Receivable and Accrued Interest—Secured ...... $2,-987,411.69." The main dispute as to this item relates to notes of corporations amounting to $1,434,764.76. They represented advances made by Miller & Co. for the completion of mortgaged buildings. They were signed by affiliated or subsidiary corporations. Although stated in the balance sheet to be "Secured," they were not secured as a matter of law. The plaintiffs contend that the defendants knew they were not secured. They further claim that the notes were of little value, to the defendants' knowledge, and, finally, that the notes signed by subsidiaries should have been shown as such.

With respect to listing the notes as secured, the defense is that Peed honestly, even if erroneously, believed them to be secured. He testified that he based his opinion on a provision in the trust indentures empowering the trustee to make advances "for payment of taxes, insurance premiums, or any other purpose for preserving the property and the lien of this instrument," or on similar provisions. As to this the trial judge charged: "As matter of law it is my opinion, and I charge you, that these advances to complete unfinished buildings are not the kind of advances that are secured under the trust deeds. The point, however, is not so clear that persons reading such parts of the deed might not, in good faith, entertain different opinions; and the good faith of the defendants in representing these advances as secured is one of the questions of fact for you to determine under all the evidence applicable to these notes, and under the rules which I will later explain to you."

 Of their several requests dealing with this subject, the appellants urge No. 38 as the most significant. This informed the jury that, if they should find that the statement as to security was false and "that the defendants represented to the plaintiffs that this was true to their own knowledge, as distinguished from belief or opinion, they are guilty of making a false balance sheet, even if they believed it to be true." It is urged that the Ultramares Case in 255 N.Y. 170, 174 N.E. 441, 74 A. L.R. 1139, points directly to the correctness of this request, but we cannot so

construe it. Accountants profess to speak with knowledge when certifying to an agreement between the audit and the entries in books audited, but there is no suggestion in the cases relied upon that a statement by an auditor that notes are secured by the provisions of a trust deed is an assertion of knowledge rather than an expression of opinion. To suggest that a title examiner was guilty of fraud if he erroneously certified a title because he had honestly misconceived the legal significance of a provision in a deed would doubtless horrify counsel for the appellants no less than other members of the legal profession. There is no reason to hold accountants to a higher standard, when they deal with legal documents. The issue of the defendants' good faith was rightly left to the jury.

■ Complaint is made of the refusal to charge request No. 67 to the effect that, if the defendants knowingly overvalued doubtful assets [the notes], then they were guilty of false representations. We cannot doubt that the jury were sufficiently informed of so obvious a proposition by the general charge as given. This request was repeated in various alternative forms covering specific details of the evidence. That the trial judge was under no duty in such a case as this to discuss in detail the evidence relating to each alleged misrepresentation we have already stated.

■ Request No. 65 relates to the failure to show that the notes were those of subsidiary or affiliated companies. The court made reference to this and to the conflicting testimony of experts as to whether good accounting practice required it. We think this was sufficient. Here also the issue was the defendants' intent, and questions of the effect of concealment and of a pretended rather than real audit were covered in the general charge.

■ *Contingent Liabilities:* We can see little excuse for omitting from the balance sheet mention of contingent liabilities. These were principally guaranties of completion of buildings under construction and might run into millions of dollars should the mortgagors default, which was not a remote possibility as shown by Miller & Co.'s prior experience. Nevertheless, Palmer, one of the defendants' experts, testified that it was proper to omit the items; and Klein and Madden said that the showing of contingent liabilities is frequently a matter of judgment and that they need not be shown when, as here, with respect to the guaranties of completion, the primary obligation was shown under the heading "Due to Mortgagors—For Bonds Underwritten—Payable as Construction Progresses ...... $8,757,379.86." The plaintiffs' expert contradicted this. The charge called attention to the conflicting testimony and instructed the jury to weigh it. The refused requests were to the effect that omission of the contingent liabilities made the balance sheet false. In view of the conflicting testimony, such a charge was properly refused. Even if it were an abuse of good accounting practice to omit them, such an abuse was not fraud unless accompanied by an intent to conceal. The issue of fraudulent concealment was fairly put to the jury in the general charge.

■ Finally, the appellants complain of the refusal to charge that, if the balance sheet represented Miller & Co. to be in a sound financial position when in fact the defendants knew it was not, then they were guilty of fraud. Variations of this proposition were contained in requests 13 and 14. Undoubtedly they were correct statements of law, but they were adequately covered by the general charge.

■ In conclusion, we may say that the trial was entirely fair to the appellants. A clear and accurate charge was delivered under which the jury might well have found a verdict for the plaintiffs. There was much in the evidence which tended to cast doubt upon the good faith of the accountants, but it did not persuade the jury. An appellate court cannot set at naught a jury's verdict merely because they might have reached a different conclusion had they been sitting as the jury. Finding no error in the charge as given and nothing clearly wrong in refusing requested instructions, we affirm the judgment.