599 F.2d 1190
 49 A.L.R.Fed. 373, Fed. Sec. L. Rep. P 96,879
 Malcolm P. McLEAN, Individually
v.
Jack ALEXANDER, Daniel D. Friel, Bernard Hessler, Jr.,
Trustee, Helen June Friel, Trustee, Frederic A. Lang, Robert
R. Walsh, Frank B. Francis, Bernard Hessler, Jr., Martin A.
Apostolico, Merle R. Aiken, Shelley P. Jones, Thomas F.
Baker, Shields & Company, Incorporated, and Cashman &
Schiavi, Malcolm P. McLean, Appellant in No. 78-2029,
Cashman & Schiavi, Appellant in No. 78-2030.
 Nos. 78-2029, 78-2030.
 United States Court of Appeals,
Third Circuit.
 Argued March 22, 1979.
Decided May 18, 1979.
 
 Edgar H. Brenner, Robert D. Rosenbaum, Washington, D. C. (argued), Hadrian R. Katz, Washington, D. C., for appellant-cross appellee Cashman & Schiavi; Milton V. Freeman, Arnold & Porter, Washington, D. C., Arthur G. Connolly, Jr., Connolly, Bove & Lodge, Wilmington, Del., of counsel.
 William P. Verdon, Donald A. Kessler, Newark, N. J., (argued), Stanley Wang, Meyner & Landis, Newark, N. J., for appellant Malcolm P. McLean.
 Shelley P. Jones, pro se.
 Before GIBBONS and HUNTER, Circuit Judges and MEANOR,* District Judge.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge:
 
 
 1
 Cashman & Schiavi (C & S) a firm of certified public accountants, appeal from a final judgment awarding Malcolm P. McLean damages in his suit under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.-10b-5, and under the Delaware common law of fraud. McLean cross-appeals from the same judgment, contending that the court erred in calculating the credit C & S should receive an account of payments made by settling joint tortfeasors and in denying prejudgment interest. The case was tried to the court without a jury. We conclude that the judgment against C & S must be reversed. Since we reverse that judgment we do not reach the issues tendered in McLean's cross-appeal.
 
 I. BACKGROUND FACTS[1]
 
 2
 On January 28, 1970 McLean purchased from its shareholders all the outstanding stock of Technidyne, Inc. (Technidyne), a Delaware corporation with its principal place of business in Wilmington, Delaware. Technidyne was a small company specializing in the manufacture of laser-beam devices for use in the construction industry. Prior to the sale it had developed as its principal product the Model V Technitool, a laser device intended to simplify the process of aligning sewer pipe in a trench. In late 1969, faced with a severe cash shortage, the managing shareholders of Technidyne began to explore the possibility of a private placement to obtain capital. They spoke to Shields & Co., a New York investment advisory firm, which circulated a report on Technidyne to prospective private investors. The report, for which the managing shareholders supplied the information, stressed that Technidyne had had success in marketing the Model V Technitool. It disclosed that Technidyne had designated American Vitrified Products (AMVIT), a sewer pipe manufacturer, as its exclusive distributor for Technitools during 1967 and 1968, and had sold 96 Technitools to AMVIT in that period. The report also disclosed that the exclusive distributorship was now terminated, but that direct selling efforts had produced 16 sales of Technitools in less than three months. The Shields report stated that it was based on information furnished by Technidyne management, and that Shields did not guarantee the truth of its contents.
 
 
 3
 McLean, a sophisticated investor with a large personal fortune and a history of successful investment in high technology businesses, learned of Technidyne later in 1969 when a business colleague sent him copy of the Shields & Co. report. After reading it, he dispatched an employee, Harry Jeter, to Wilmington to make further inquiries. On January 6, 1970, Jeter met with Daniel Friel, a substantial Technidyne stockholder, and with Jack Alexander, Robert R. Walsh, and Shelley P. Jones, President, General Manager, and Vice President for Sales, respectively, of Technidyne. Jones and Friel informed Jeter that the sixteen direct sales mentioned in the Shields report had increased to 41 sales. During the meeting Technidyne management also relied upon two written "projections." One of the projections referred to the 41 "sales" as orders, but the district court found that these orders were consistently orally represented to be sales. A second projection stated that AMVIT had sold 114 Technitool units in 2 1/2 years with a very limited sales effort. Friel and Walsh also told Jeter that the exclusive distributorship with AMVIT had been terminated because of AMVIT's economic problems. The district court found that Jeter and McLean saw the two projections and relied on them in acquiring the Technidyne stock. On January 7, 1970, Jeter was given a Certified Report of Examination of Technidyne, prepared by C & S, for the eleven month period ending November 30, 1969. More particular reference will be made to that report hereafter. McLean read the C & S Report while he was considering the purchase of Technidyne.
 
 
 4
 Following Jeter's visit, McLean also visited the Technidyne plant, meeting with Jones, Friel, Alexander and Walsh. McLean again was told that the AMVIT distributorship was terminated because of AMVIT's poor performance. At a second meeting with McLean, Friel relied heavily on the sales projections referred to above in promoting the sale of the company.
 
 
 5
 On January 28, 1970, a stock purchase agreement was executed by Jeter as agent for McLean and Friel as agent for all the Technidyne stockholders. McLean agreed to pay $1,950,000.00 for 535 shares of Technidyne stock, as follows: $399,998.10 at Closing; $1,300,001.85 in non-interest bearing promissory notes; and $250,000.00 to satisfy an outstanding Technidyne debt. The C & S Report of Examination showed assets of only $188,419, and negative earnings. Thus it is clear that the purchase price reflected McLean's interest in future sales rather than in present assets or past earnings.
 
 
 6
 After consummation of the stock purchase McLean gradually learned that the shareholders' representations regarding the pre-closing sales of the Model V Technitool and the relationship of Technidyne with AMVIT had been false. Although AMVIT had purchased a hundred-odd units, it had succeeded in selling only 35, retaining approximately seventy in its inventory. Moreover, the AMVIT distributorship agreement had been terminated not because of AMVIT's poor performance, but because the poor quality of the Technidyne units had resulted in frequent product breakdowns. The 41 sales represented as having occurred after termination of the AMVIT relationship turned out to be either mere orders, sales conditioned on resale, or consignments. By June or July of 1970 McLean realized he had been defrauded. Meanwhile he made substantial advances to Technidyne, eventually totalling $564,751, first in an effort to keep it afloat, and then to assist in the orderly winding up of the business. Finally in October, 1970, the company closed its doors.
 
 
 7
 McLean sued the selling shareholders, Shields & Co., and C & S. C & S cross-claimed against the other defendants for contribution. During the course of a lengthy trial McLean settled his claims against Shields & Co. and the individual stockholders.[2] In the settlement agreement McLean agreed to indemnify the settling defendants (except Jones) against any liability on the cross-claim by C & S. The case against C & S went forward, resulting ultimately in a determination that McLean had suffered $2,514,751 in damages, for which C & S was liable as a joint tortfeasor. Applying relative fault principles, however, the court concluded that C & S was only 10% Responsible for the plaintiff's injury, and was therefore entitled to a 90% Contribution from the defendants. Since the selling shareholders were indemnified by their settlement with McLean for any contribution recovery by C & S, that recovery was offset directly against McLean's award, thereby reducing C & S's direct liability to $199,105.87. The court denied prejudgment interest, and entered judgment in that amount. This appeal and cross-appeal followed.
 
 II. C & S's LIABILITY
 
 8
 From what has been said above, it is evident that McLean was induced to purchase the stock of Technidyne by representations concerning past sales, and future sales potential, of the Model V Technitool, and that those representations were false. Specifically, the representation that AMVIT had sold 114 Technitool units in 2 1/2 years was false, as was the representation that 41 more units had been sold after the termination of the AMVIT distributorship. This fraud was substantial and pervasive.
 
 
 9
 The claim against C & S, however, is a much narrower one. C & S was not at any time privy to the negotiations between the stockholders and McLean, nor did it have any knowledge of the broad representations made during those meetings. So far as appears, the only contact between C & S and McLean was McLean's receipt, through Technidyne's management, of a copy of the November 30, 1969 Certified Report of Examination prepared by C & S, which contained an audited balance sheet dated November 30, 1969, the full text of which is set out in the margin.[3] Only one item on this balance sheet the statement of $73,733 in accounts receivable was found at trial to be false or misleading. The report accurately showed a deficit in retained earnings of $91,647 and negative stockholders' equity of $66,331. It showed total assets of $188,419, and this figure is also substantially accurate, since if the accounts receivable were overstated the inventory of $66,111 was correspondingly understated.
 
 
 10
 McLean, however, was paying many times the total value of the assets shown on the balance sheet, and was primarily interested in sales potential. The district court found that McLean viewed the $73,733 figure "as representing almost entirely the accounts due and owing as a result of the 16 recent sales referred to in the Shields Report. . . ."[4] It further found that
 
 
 11
 McLean and Jeter, relying upon the independence of the outside auditors, viewed the audit as confirming what they had previously been told and seen regarding the marketability of Technidyne's pipe-laying tool.[5]
 
 
 12
 It therefore stated the issue for trial as follows:
 
 
 13
 In light of a settlement between the purchaser plaintiff and both the shareholders and investment banker, the primary issue before the Court is whether the accountant proceeded in a deliberate, knowing or reckless manner in the preparation of his audit such that the plaintiff, relying on material information provided or omitted by defendant, incurred a loss protected by section 10(b) of the Securities Exchange Act of 1934.
 
 
 14
 The gravamen of McLean's complaint is that Schiavi knowingly or recklessly represented to McLean as a member of the investing public, that Technidyne had "hard" sales whereas in fact the underlying transactions were merely consignments or guaranteed sales.[6]
 
 
 15
 The court then proceeded to determine that the audited statement of accounts receivable, as evidence of sixteen actual sales, was material to McLean's investment decision, that he relied upon that information, and that in purchasing the stock he acted with due diligence.[7] At this point the court appears to have shifted the burden of proof to C & S, writing:
 
 
 16
 Having established that the defense of due diligence is not substantiated, attention is turned to the remaining defenses: good faith, conformance with generally accepted accounting principles, lack of privity and a defense that a certified audit is merely an expression of opinion.
 
 
 17
 Defendants' reliance on the defense of good faith brings into focus the state of mind of the accountant and the degree of culpability deemed necessary to incur 10b-5 liability.[8]
 
 
 18
 The quoted language suggests that if it were established that the C & S Report of Examination was inaccurate the burden would shift to the accountant to prove affirmatively that it had not acted with an intent to defraud or in reckless disregard of the truth. The court then concluded:
 
 
 19
 . . . (C & S's) conduct constitutes far more than mere negligence, but falls short of a preconceived actual intent to defraud. His behavior embraces both actual knowledge of material facts not revealed and reckless disregard of the truth.[9]
 
 
 20
 Apparently then, the court, assuming C & S to have the burden of negating actual intent to defraud, held that burden to have been met. But reviewing the record upon the assumption that C & S had to establish freedom from actual knowledge of material facts not revealed, and to negate reckless disregard of the truth, the court concluded that burden had not been met.
 
 
 21
 In placing the burden of negating scienter upon the defendant, the court appears to have relied upon language in the Senate Report on S. 3420, S.Rep. No. 792, 73d Cong., 2d Sess. 12-13 (1934), referring to the express civil liability provisions in the 1934 Act.[10] While the district court's opinion is not completely clear on this issue, and while we think that a shift in the burden of proof would not have influenced the outcome of this litigation, we know of no judicial authority relieving a plaintiff of the burden of going forward or of persuasion on each element of an implied cause of action under § 10(b) including scienter.[11] We therefore disapprove any suggestion in the lower court's opinion that the defendant must affirmatively show the absence of intent.
 
 
 22
 The issue, then, is whether the plaintiff has made an affirmative showing that Schiavi acted with the scienter required to sustain a claim under § 10(b). This in turn requires an inquiry into the governing standard of liability, and the case on which both sides rely, Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In Hochfelder the Supreme Court, resolving a dispute among the circuits, concluded that an accounting firm could not be held liable under § 10(b) for conduct which the plaintiff alleged to be "inexcusable negligence." 425 U.S. at 190 n.5, 96 S.Ct. at n.5. Scienter is a necessary element of a § 10(b) cause of action. But while the Court closed the door on negligence actions, it included in a footnote a statement which is rapidly becoming as famous as the main text:
 
 
 23
 (T)he term "scienter" refers to a mental state embracing intent to deceive, manipulate, or defraud. In certain areas of the law recklessness is considered to be a form of intentional conduct for purposes of imposing liability for some act. We need not address here the question whether, in some circumstances, reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b-5.
 
 
 24
 425 U.S. at 194 n.12, 96 S.Ct. at 1381, n.12. Since the Hochfelder decision this court and other Courts of Appeals which have considered the issue reserved in Hochfelder have unanimously agreed that reckless conduct is actionable under § 10(b).[12] In Coleco Industries, Inc. v. Berman, 567 F.2d 569 (3d Cir. 1977) (per curiam), cert. denied, 439 U.S. 830, 99 S.Ct. 106, 58 L.Ed.2d 124 (1978), we approved Judge Huyett's statement that the scienter element in a § 10(b) case required " 'a conscious deception or . . . a misrepresentation so recklessly made that the culpability attaching to such reckless conduct closely approaches that which attaches to conscious deception'." 567 F.2d at 574 (quoting 423 F.Supp. 274, 296 (E.D.Pa.1976)). The Coleco court had no need to "precisely define" the legal standard for recklessness, because it concluded that on any formulation of that standard, the plaintiff there had failed to make out a Rule 10b-5 claim. Id. This case requires us to address that issue.
 
 
 25
 In Sundstrand Corp. v. Sun Chemical Corp., supra, the Seventh Circuit stated the minimum threshold for liability under § 10(b) as follows:
 
 
 26
 "(R)eckless conduct may be defined as . . . highly unreasonable (conduct), involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."[13]
 
 
 27
 In context, the Sundstrand formula was applied only to omissions, but the standard of liability proposed there is, we think, equally applicable to misstatements, and we approve it in both contexts. Accord, Rolf v. Blyth, Eastman Dillon & Co., supra, 570 F.2d at 47.
 
 
 28
 The Sundstrand formulation of recklessness makes it clear, as did Hochfelder, that negligence whether gross, grave or inexcusable cannot serve as substitute for scienter. At the same time, as applied to the somewhat specialized area of accountants' liability, that standard preserves a federal right of action for the kind of accountants' fraud that has been generally recognized as actionable at common law since the leading case of Ultramares Corp. v. Touche, 255 N.Y. 170, 174 N.E. 441 (1931). Judge Cardozo's opinion in Ultramares would have permitted recovery for fraud upon a showing that a misrepresentation was made knowingly or wilfully, or with reckless disregard for its truth or falsity,[14] or without a "genuine belief" in its truth.[15] Further, fraud "includes the pretense of knowledge when knowledge there is none."[16] As Judge Swan made clear in O'Connor v. Ludlam, 92 F.2d 50, 54 (2d Cir. 1937), also an accountants' liability case, in an action for fraud under the Ultramares standard:
 
 
 29
 the issue (is) whether the defendants had an honest belief that the statements made by them were true. "If they did have that honest belief, whether reasonably or unreasonably, they are not liable. If they did not have an honest belief in the truth of their statements, then they are liable, so far as (scienter) is concerned."
 
 
 30
 It seems to us that the purpose of footnote 12 of the Hochfelder opinion was to preserve, at least in the context of accountants' liability, the standards of scienter developed in Ultramares and O'Connor v. Ludlam. And the core requirement of those cases is that the plaintiff establish that the defendant lacked a genuine belief that the information disclosed was accurate and complete in all material respects. Accord, Sundstrand Corp. v. Sun Chemical Corp., 553 F.2d at 1045 n.20.
 
 
 31
 We stress that to prove scienter the plaintiff need not produce direct evidence of the defendant's state of mind. Circumstantial evidence may often be the principal, if not the only, means of proving bad faith. A showing of shoddy accounting practices amounting at best to a "pretended audit,"[17] or of grounds supporting a representation "so flimsy as to lead to the conclusion that there was no genuine belief back of it"[18] have traditionally supported a finding of liability in the face of repeated assertions of good faith, and continue to do so. In such cases, the factfinder may justifiably conclude that despite those assertions the "danger of misleading . . . (was) so obvious that the actor must have been aware of it." Sundstrand Corp. v. Sun Chemical Corp., supra, 553 F.2d at 1045.
 
 
 32
 The district court took one line from the balance sheet, the reference to accounts receivable, and on that line built its finding that C & S was a joint tortfeasor. The line must, however, be placed in its context. The C & S opinion letter at the outset of the report states that its certification applies only to the balance sheet, not to the statements of operations and retained earnings, and that its "examination was made in accordance with generally accepted auditing standards, and accordingly included such tests of the accounting records and such other auditing procedures as we considered necessary in the circumstances. . . ." The representation was, then, an expression of opinion based upon generally accepted auditing standards. C & S could be held to have the necessary scienter only if the evidence supports an inference that when it expressed the opinion it had no genuine belief that it had the information on which it could predicate that opinion.
 
 
 33
 The accounts receivable of $73,733 shown in the balance sheet included alleged sales to four customers:
 
 
 34
 L.B. Smith, Inc.--5 Model V
 Technitools $19,990.00
Robbins Instruments Service Co.
 1 Model V Technitool 5,675.00
Southern Laser Co.--10 Model V
 Technitools 39,980.00
Erie Marine 5,911.50
 ----------
 $71,556.50
 
 
 35
 Although the defendants contended these sales had occurred, testimony by agents of L. B. Smith, Robbins, and Southern Laser established to the satisfaction of the court that the sixteen transactions were in the nature of consignments. There was no evidence that Schiavi, the C & S partner in charge of the audit, had actual knowledge of the consignment arrangements, or even that he was aware of the risk that they were consignment sales. Thus C & S could be held to have the requisite scienter only if the investigation it made, and the knowledge it had, give rise to an inference that it "must have been aware" of the risk that the accounts receivable item was misleading. Upon examination of the evidence bearing on Schiavi's investigation of the four questioned accounts, we conclude that such an inference was not permissible in this case.
 
 The L. B. Smith Transaction
 
 36
 Schiavi examined purchase orders and invoices relating to the L. B. Smith transaction. With respect to that documentation, the district court found: "the underlying documentation does not clearly indicate that the transaction involving the five Model V Technitools was anything other than a sale, albeit an installment sale with an unspecified future delivery date."420 F.Supp. at 1068. The district court, however, concluded that several inconsistencies in the documentation should have put Schiavi on notice that the sale was in fact a consignment. Thus, the L. B. Smith purchase order, executed October 7, 1969, indicated that one unit was delivered at the time of purchase and that the remaining four were to be delivered "A.S.A.P." (presumably meaning "as soon as possible.") The district court concluded a Technidyne invoice dated November 30, 1969 (Alex.Ex.E(1)) and sent to L. B. Smith, was inconsistent with the A.S.A.P. notation, since it stated that these four units were still being held in Technidyne's warehouse. From another perspective, however, the invoice was consistent with the purchase order, which also indicated that four of the five units were being held in Technidyne's warehouse, where Schiavi observed them. 420 F.Supp. at 1069. The court also found that the L. B. Smith invoice was inconsistent with the purchase order, since the former called for one third payment within 60 days (I. e., by December 6) while the invoice demanded payment in mid-January. Schiavi testified, however, that he was aware that Technidyne had had a bill and hold practice with AMVIT. The documentation was entirely consistent with such an arrangement with L. B. Smith.
 
 
 37
 Schiavi also made an effort to obtain confirmation of the accounts receivable by sending each customer a written confirmation request. In December, 1969, when asked by Walsh what was delaying the audit report, Schiavi responded that he was awaiting responses to confirmation requests. Jones then arranged to have telephone calls made to the customers requesting telegrams be sent to C & S. A telegram was sent from L. B. Smith:
 
 
 38
 This will confirm our purchase order number BA51794 for 5 Number 5 Units of Technidyne.
 
 
 39
 The district court points out, correctly, that this telegram is not fully responsive to the C & S request for confirmation, in that it confirms a purchase order rather than an amount due and owing. The telegram was not, however, inconsistent with the Technidyne documentation of a sale. Finally, the district court noted the suspicious fact that the L. B. Smith invoice was dated November 30, 1969, the closing date of the audit. If we were applying a negligence standard we could affirm a finding that given the one month discrepancy in the due dates between the invoice and purchase order, the late issuance of the invoice, and the ambiguity in the telegraphic confirmation, Schiavi should have made further inquiry of management or of L. B. Smith before concluding that the account receivable was genuine. But we cannot hold that these factors, standing alone, were evidence that C & S was aware that it was without sufficient knowledge to form that opinion. Such a holding would obliterate the distinction between tortious conduct requiring scienter, which the Hochfelder construction of § 10(b) demands, and negligence, which Hochfelder found insufficient.
 
 The Robbins Transaction
 
 40
 The Robbins unit, unlike those involved in the L. B. Smith and Southern Laser transactions, was delivered. The court found that "(t)he documentation on the Robbins Instrument Service Company ("Robbins") transaction (Alex.Ex.F 26) . . . does not appear to be inconsistent with a conclusion that the delivery on September 23, 1969, was indeed a sale." 420 F.Supp. at 1069. But while the purchase order indicates that payment would be due within 30 days of delivery, no invoice was issued until nearly five weeks later, and the invoice recited payment as 30 days net. Schiavi made no management inquiry regarding this discrepancy. In addition, C & S sent a confirmation request to Robbins, which was never answered. The accounting experts who testified on behalf of C & S expressed the opinion that it was not unusual in conducting an audit to obtain less than 100% Returns on confirmation requests.[19] The court concluded that the discrepancy between the due date in the purchase order and in the invoice, and the absence of a confirmation, suggested the need of further inquiry to Robbins. If we were applying a negligence standard we would agree. But although the question is a close one, we cannot hold that these factors, standing alone, were evidence that C & S knew that it lacked the knowledge required to form an opinion that Technidyne had sold one unit to Robbins. Moreover, even if the evidence supported a holding of recklessness with respect to this single sale, that would not of itself support a finding of liability, since a single sale among sixteen would not of itself be material.
 
 The Southern Laser Transaction
 
 41
 The Southern Laser purchase order and invoice, like those of L. B. Smith and Robbins, indicate an outright sale of ten units. While there were inconsistencies in the stated payment dates of the order and the invoice, Schiavi made inquiries of management regarding them. As in the case of L. B. Smith, the Southern Laser units were segregated in Technidyne's warehouse. C & S assumed that, as with AMVIT, Technidyne had a bill and hold arrangement with Southern Laser under which shipment would be made direct to its customers from that warehouse. A confirmation request was also sent to Southern Laser. When that request was not returned, a Technidyne salesman, Joe Daniel, received instructions from Technidyne to prod the customer to respond. Instead, Daniel called Western Union in Atlanta and caused a telegram to be sent to C & S as follows:
 
 
 42
 Affirmation of Order for 10 Model 5 Technidyne Lasers for $39,995.00 is correct Tom Methvin Southern Laser Co.
 
 
 43
 C & S accepted the telegram as genuine, and as a confirmation of the underlying documents and the management representation. Like the L. B. Smith confirmation, this telegram is not literally responsive to the request for confirmation of an amount due. It is, however, entirely consistent with Technidyne's documentation of a sale, and no information was brought home to C & S that it was not genuine. The district court said of the Southern Laser telegram:
 
 
 44
 However, in total and reckless disregard of the facts that he had never had any prior contact with, or knowledge of Southern Laser, that the telegram was a non sequitur in relation to the confirmations and that he had no way of knowing who sent it, Schiavi never bothered to contact Methvin.
 
 
 45
 420 F.Supp. at 1070. With deference, we cannot believe that this is the standard of scienter which Judge Cardozo had in mind in Ultramares. At best, the retention of the units in the warehouse and the fact that the telegram referred to a purchase order rather than an amount due is evidence of possible negligence. It cannot support a finding that C & S knew it lacked the knowledge required to form the opinion that the Southern Laser account was genuine. The existing documentary evidence, the inquiries of management, the awareness of the past bill and hold practice, and the partial telegraphic confirmation simply cannot be characterized as "grounds . . . so flimsy as to lead to the conclusion that there was no genuine belief back of" Schiavi's representation to that effect.
 
 The Erie Marine Account
 
 46
 The request for confirmation to Erie Marine elicited a response in which it disputed about $2000 of the amount due. The response enclosed correspondence from Walsh, the Technidyne general manager, explaining the differences between that Company and Erie Marine over the amount due. This dispute was not footnoted in the C & S report. But clearly that omission was, for purposes of McLean's investment decision, immaterial. At best a footnote would have disclosed that Erie Marine acknowledged purchasing Technidyne products, but disagreed with management over $2000 of a nearly $40,000 initial purchase price. The Erie Marine dispute does not bear at all upon the genuineness of the 16 sales to L. B. Smith, Robbins, and Southern Laser.
 
 
 47
 The court relied on several other factors in reaching the conclusion that C & S was a joint tortfeasor. It noted that C & S had prior to the request for a certified report done other accounting work for Technidyne, and was thus familiar with its generally poor financial health. That generally poor financial health was glaringly disclosed in the certified report, however, and there is no evidence in the record suggesting that anything C & S learned from its prior work should have alerted it to the fact that its officers were about to engage in a fraud. The court also placed great emphasis upon the fact that C & S was informed that the certified audit was required for the purpose of obtaining an infusion of capital through a private placement, and that the report was needed quickly. These facts are certainly relevant, but do not alone or together with any other facts respecting C & S's conduct lend support for the conclusion that C & S knew it lacked the information on which to base an opinion as to the amount of Technidyne's accounts receivable.
 
 
 48
 The court also stressed the language in the C & S report describing the accounts receivable as "Considered Fully Collectible." Schiavi, as well as the expert witnesses who testified to standard of care, both testified that this language was a means of explaining the absence of a reserve for bad debts. McLean's fraud claim is not predicated upon the collectibility of the accounts receivable, but rather on their existence, as evidence of product acceptance in the marketplace. Thus had the "Considered Fully Collectible" language been omitted, or had C & S made a credit check on the four customers and included a reserve for bad debts, the effect on McLean's investment decision, given his theory of recovery, would have been slight. Insofar as the Considered Fully Collectible language assumes the accountant's underlying judgment that valid sales had occurred, McLean still must show that the evidence upon which Schiavi relied in reaching that opinion supports the conclusion that the figure of $73,733 was included with reckless disregard of the existence of the underlying accounts. We have indicated above that it does not. The accountant examined purchase orders and invoices which appeared genuine, received representations from management, took steps to obtain confirmation from the account debtors, and received partial confirmation of 15 of the 16 sales centrally in issue. C & S may have been negligent in not discovering management's fraud, but it did not act with reckless disregard for the truth.
 
 
 49
 The foregoing analysis also disposes of the district court's somewhat strained holding that Schiavi had "actual knowledge of material facts" not disclosed in his audit, and that he was therefore liable under the rule of Rochez Bros., Inc. v. Rhoades, 491 F.2d 402, 407-08 (3d Cir. 1974), and Thomas v. Duralite Co., 524 F.2d 577, 584 (3d Cir. 1975). Specifically, the court concluded that those various bits and pieces of evidence available to Schiavi which tended to suggest the possibility that the asserted sales were in fact consignment arrangements were "materials facts,"[20] which would have been important to McLean in his investment decision. Hence, Schiavi's failure to refer to these facts in his report was a failure to disclose material facts known to him and was actionable under Rochez Bros., 420 F.Supp. at 1084.
 
 
 50
 We have no doubt that Rochez Bros. survives Hochfelder : a failure to disclose facts whose disclosure one knows to be necessary in order to avoid the risk of materially misleading a buyer or seller is actionable under § 10(b). But this is not such a case. The general rule is that where intent is an element of an offense, it must be shown with respect to each other element thereof. In line with this rule, the Rochez standard requires knowledge, not only of the facts withheld, but also of the risk that the buyer or seller will be thereby misled. Here, the defendant professed to believe that his statement of opinion did not present such a risk, and the circumstantial evidence introduced has been held insufficient to support an inference that this belief was not genuinely held. Given that conclusion, a holding that Schiavi "knowingly" withheld material information within the meaning of Rochez Bros. is precluded.
 
 
 51
 The district court concluded that the standard of liability for common law fraud under Delaware law is the same as that for liability in an action implied from § 10(b). Although no Delaware case to which our attention has been called has dealt with the standard of liability of an accountant for rendering an insufficiently informed opinion, Eastern States Petroleum Co. v. Universal Products Co., 24 Del.Ch. 11, 3 A.2d 768, 775 (Del.Ch.1939), suggests that Delaware would apply the Ultramares rule. Thus we agree with the district court that the elements of a § 10(b) and a Delaware fraud action are the same. Since those elements are not satisfied in this case the judgment appealed from must be reversed.
 
 III. CONCLUSION
 
 52
 Because we hold that C & S is not liable to McLean there is no occasion to discuss the method by which contribution and indemnity were calculated, or the court's ruling on pre-judgment interest. The judgment appealed from will be reversed. The cross-appeal will be dismissed as moot.
 
 
 
 *
 Honorable Curtis H. Meanor, United States District Judge for the District of New Jersey, sitting by designation
 
 
 [1]
 The District Court's opinion on the issue of liability contains an exhaustive statement of the factual setting of this litigation. McLean v. Alexander, 420 F.Supp. 1057, 1061-74 (D.Del.1976). The opinion on damages and contribution is reported at 449 F.Supp. 1251 (D.Del.1978)
 
 
 [2]
 Shields & Co. paid $45,000. The shareholders surrendered notes of McLean valued at $1,300,001.85 in exchange for $70,000 in cash, and "in kind" items (patents, copyrights, engineering note books and the like) valued at $5,000. Thus after the partial settlement McLean was still out of pocket the $399,998.10 in cash paid at the Closing, the $564,751 invested in Technidyne directly, the $250,000 paid to cancel the Technidyne debt, and the $75,000 paid to obtain cancellation of the notes, less the $45,000 Shields payment: a total of $1,244,749.10
 
 
 [3]
 
 ASSETS
Current Assets:
 Cash $ 7,544
 Accounts Receivable--Considered
 Fully Collectible 73,733
 Inventories--At Lower of Cost or
 Market 66,111
 Notes Receivable--Stockholders 6,775
 Refund Due From Prior Income
 Taxes Paid 13,392
 Prepaid Expenses 3,449
 ---------
 Total Current Assets $171,004
 Property and Equipment--
 At Cost:
 Plant Equipment $ 14,537
 Leasehold Improvements 2,749
 Office Equipment 3,902
 ---------
 Total $ 21,188
 Less--Depreciation Taken To Date 3,873
 ---------
 Net Property and Equipment 17,315
Other Asset--Utility Deposit 100
 ---------
Total Assets $188,419
 LIABILITIES
Current Liabilities:
 Accounts Payable $ 52,479
 Note Payable--Bank of Delaware
 8%--Demand 200,000
 Payroll Taxes Payable 667
 Accrued Expenses 1,604
 ---------
 Total Liabilities $254,750
 STOCKHOLDERS' EQUITY
Capital Assigned to Shares:
 Common Stock--1,000 No Par
 Shares Authorized of which
 535 Shares are Issued and
 Outstanding $ 25,316
Retained Earnings (Deficit)
 (Exhibit B) (91,647)
 ---------
 Total Stockholders' Equity (66,331)
 ---------
 Total Liabilities and Stockholders'
 Equity $188,419
 ---------
 
 
 [4]
 McLean v. Alexander, supra, 420 F.Supp. at 1065
 
 
 [5]
 Id
 
 
 [6]
 Id. at 1074-75
 
 
 [7]
 Id. at 1075-79. Because of our resolution of the scienter issue we express no opinion on the district court's resolutions of other issues bearing upon liability
 
 
 [8]
 Id. at 1079-80. The court elsewhere concluded that the standard for liability under the Delaware Common Law and under § 10(b) is the same. D. at 1085-86
 
 
 [9]
 Id. at 1080 (footnotes omitted)
 
 
 [10]
 In Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court relied on the same report in support of its conclusion that negligence alone would not support a Section 10(b) recovery. 425 U.S. at 205-06, 96 S.Ct. 1375
 
 
 [11]
 Indeed, this must have been a central if unarticulated premise of Hochfelder, since if the burden was not upon the plaintiff to prove scienter, then he need not have alleged it in his complaint
 
 
 [12]
 Rolf v. Blyth Eastman Dillon & Co., 570 F.2d 38, 44-47 (2d Cir.), cert. denied, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); Coleco Industries, Inc. v. Berman, 567 F.2d 569, 574 (3d Cir. 1977), cert. denied, 439 U.S. 830, 99 S.Ct. 106, 58 L.Ed.2d 124 (1978); First Virginia Bankshares v. Benson, 559 F.2d 1307, 1314 (5th Cir.), cert. denied, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978); Sundstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033, 1044 (7th Cir.), cert. denied, 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977); Nelson v. Serwold, 576 F.2d 1332, 1337-38 (9th Cir.), cert. denied, 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978). The First Circuit has reserved decision on the issue. Cook v. Avien, Inc., 573 F.2d 685, 692 (1st Cir. 1978)
 
 
 [13]
 553 F.2d at 1045 (quoting Franke v. Midwestern Oklahoma Development Authority, 428 F.Supp. 719, 725 (W.D.Okl.1976))
 
 
 [14]
 255 N.Y. at 186, 174 N.E. at 447
 
 
 [15]
 Id. at 189, 174 N.E. at 448
 
 
 [16]
 Id. at 179, 174 N.E. at 444
 
 
 [17]
 O'Connor v. Ludlam, supra, 92 F.2d at 54
 
 
 [18]
 Ultramares Corp. v. Touche, supra, 255 N.Y. at 186, 174 N.E. at 447
 
 
 [19]
 McLean presented no testimony as to the standard of care in the accounting profession
 
 
 [20]
 The district court did not explain or justify its conclusion that the specific facts referred to were "material" for the purposes of Rule 10b-5, and in view of our disposition of the issue, we express no opinion on that holding