**COLECO INDUSTRIES, INC.,**
**Appellant in No. 76–2328,**

v.

**Abe BERMAN, Appellant in No. 76–2331, Joseph Rubin, Irving Cohen, Lewis M. Cohen, Frederick Cohen, and Zelnick, Sobelman & Company.**

**Appeal of Joseph RUBIN, Irvin Cohen, Lewis M. Cohen, etc., in No. 76–2329.**

**Appeal of ZELNICK, SOBELMAN & COMPANY, in No. 76–2330.**

**Nos. 76–2328 to 76–2331.**

United States Court of Appeals, Third Circuit.

Argued Oct. 18, 1977.

Decided Nov. 25, 1977.

Bruce D. Lombardo, Harvey, Pennington, Herting & Renneisen, Ltd., Philadelphia, Pa., for appellant in 76–2330 and appellee in 76–2328/9 and 76–2331.

Joseph A. Yablonski, Charles R. Both, Daniel B. Edelman, Yablonski, Both & Edelman, Washington, D. C., David Berger, Richard A. Sprague, Michael K. Simon, David Berger, P.A., Philadelphia, Pa., for appellant, Coleco Industries, Inc.

Daniel B. Pierson, V. Pierson, Jones & Nelson, P.C., Philadelphia, Pa., for appellant, Joseph Rubin.

Theodore R. Mann, Barry E. Ungar, Larry H. Spector, Mann and Ungar, Prof. Assoc., Philadelphia, Pa., for appellants Irvin Cohen, Lewis M. Cohen and Frederick Cohen.

Glenn C. Equi, Bruce D. Lombardo, Robert J. McKee, Jr., Martin J. Resnick, E. Harris Baum, Zarwin, Baum, Arangio & Somerson, P.C., Philadelphia, Pa., for appellant, Abe Berman; Harvey, Pennington, Herting & Renneisen, Ltd., Philadelphia, Pa., of counsel.

Before ADAMS and GARTH, Circuit Judges, and LAYTON, District Judge.*

## OPINION OF THE COURT

PER CURIAM:

This factually-complex case arises out of the 1973 acquisition of Royal All-Aluminum Swimming Pool Corp. by a 100% stock purchase on the part of Coleco Industries, Inc. Royal's shareholders were Abe Berman, Joseph Rubin, and Irvin, Lewis and Frederick Cohen. Berman acted as president and sales manager, Rubin functioned as vice president, design engineer and production manager, while the Cohens provided financial support to Royal. Berman, Rubin and the Cohens, along with Zelnick, Sobelman and Co., Royal's accountants, were the defendants in the $1.3 million securities fraud action which forms the nucleus of the complaint in this case.

The trial court's extensive opinion, reported at 423 F.Supp. 275–324 (E.D.Pa. 1976), sets forth the circumstances of this case in detail. We therefore present only a capsule review of the events giving rise to the lawsuit.

## I. THE FACTS

### A. History of the Case

In 1971, Berman, Rubin and the Cohens incorporated Royal, with the objective of using Berman and Rubin's expertise in manufacturing and marketing above-ground aluminum swimming pools. Royal had a moderately successful year in 1972, making inroads on other pool suppliers' markets, but sold 600 instead of an expected 900 pools, sustaining a net loss of $172,-000.[1]

The combination of a potentially-successful product and a financial squeeze caused by under-capitalization attracted the attention of Coleco, a Connecticut corporation active in the swimming pool field. After initial inquiries in January of 1973, negotiations commenced regarding the purchase of Royal by Coleco. While the original proposition discussed was a $1 million acquisition, the Coleco principals wished to defer consummating the arrangement in order to await the performance of a certified audit of Royal. The Royal officials pressed for

---

\* United States District Judge for the District of Delaware, sitting by designation.

1. The initial capitalization of the firm was $84,-000 and a bank loan provided an additional $100,000.

an immediate purchase, contending that Royal's current financial situation was so fragile that an immediate infusion of new capital was necessary.

The difference was resolved by a purchase agreement which provided for a firm $500,000 to be paid in four installments, and $500,000 of the purchase price to be made contingent upon the profitability of Royal in succeeding years. In addition, the Royal principals warranted the correctness of Royal's financial statement for the first quarter of 1973 (April 30 statement). Rubin and Berman were to be retained to manage the company at specified salaries. The agreement of sale was signed on June 4, 1973. It is conceded that the April 30th statement underestimated the total inventory set forth by Royal by at least $49,922.

By November 1973, Rubin had quit, Berman had been fired, Coleco had expended— by its estimates—$1.3 million on Royal, Royal had barely broken even, and Coleco was in the process of transferring what was left of Royal to its subsidiary ABCO.

Coleco filed suit on December 4, 1973. The proceeding began as a jury trial, but halfway through the trial the jury was dismissed. After the evidence was closed, Judge Huyett made extensive findings of fact and conclusions of law which are set forth in the course of his opinion.

The interpretation of how matters advanced through each of the various stages is, of course, hotly contested. The first dispute centers on the representations which were made to Coleco before the sale. Coleco claims it was misled as to the profitability of Royal. It points out that on April 18, 1973 Rubin told a Coleco principal that Royal was realizing a gross profit of $500 per pool, and that the April 30, 1973 first quarter report showed a gross profit of $200,000 on the sale of 400 pools.

All parties agree that the April 30 statement was in error, underestimating the cost of the pools manufactured by $49,922, as a result of accounting errors. In addition, Coleco claims that by comparing the April 30 figures with the figures derived from a June, 1973, audit, the cost of the 400 pools was understated by an additional $80,272.[2]

Berman, Rubin and the Cohens (hereinafter the "Royal defendants") respond that the April 18 representation regarding the gross profit per pool was made in good faith. The trial court agreed, finding that the representation was that Rubin "believed" that he was making $500 per pool, and that such was in fact the state of Rubin's belief (423 F.Supp. 285, 289). Moreover, the Royal defendants challenge the plaintiff's accounting methods, admitting only the $49,922 discrepancy, and argue that they were misled as much as the plaintiff by the errors of Zelnick, their accountant. The trial court did not pass on this contention explicitly, although it found Zelnick liable to the defendants for the $49,922 error, on the basis of Zelnick's "obvious and mechanical" mistakes (423 F.Supp. 308–310, 310 n.59).

The major factual disagreement between the parties regarding the various events following the purchase concerns the cause of the business difficulties experienced by Royal. All admit that by the end of the summer, Royal was unable to meet the orders for which it had contracted, and that its operation was beginning to fall apart despite overtime work on the part of Rubin.

Coleco claims that the operation was doomed from the start, given the underestimated profit margin. The Royal defendants contend that the root of the problems was mismanagement by Coleco. While the trial court found that Rubin had informed

---

**2.** Coleco also claimed at trial that one of the new lines of pools manufactured in 1973 by Royal was defectively designed, and that this item was covered by the warranties accompanying sale.

The Royal defendants contended that the subsequent failures in the pools were the result of shoddy workmanship by suppliers, and that

Coleco had been informed of difficulties experienced in obtaining appropriate work from suppliers before the Coleco purchase. This dispute receded to the background on appeal, perhaps because the trial court found that even assuming that the pool failures were actionable, no damages had been proven as a result of such failures.

Coleco that successful operation on the scale it contemplated would require immediate infusions of capital, along with personnel and material from Coleco, in fact the expenditures of money by Coleco on the Royal operation were delayed, and the men and materials never arrived. Moreover, Coleco's management antagonized both Rubin and Berman, the lynchpins of the operation, to the point where one left and the other had to be discharged.

The trial court supported the Royal defendants. It determined: "Royal failed, we find it much more probable than not, because Coleco mismanaged it after the acquisition." [3]

Berman and Rubin both assert that they were driven out—Berman that he was fired without cause, and Rubin that he was forced to resign by intolerable working conditions and lack of cooperation. Both seek to recover the salaries promised them under the contract. Coleco responds that Berman had been derelict in his duty, and that under New Jersey law Rubin's resignation bars recovery on an employment contract. The trial court found for Rubin and against Berman.

### B. The Suit

By the time this case reached trial, each of the parties, except Zelnick, had invoked a plethora of remedies. Zelnick, however, had settled with Coleco for $350,000 and had become a third-party defendant. In broad overview, the holdings of the trial court were as follows:

(1) Coleco had no valid claim under 15 U.S.C. § 78j(b) and SEC Rule 10b–5. Whatever misrepresentations occurred were made in the belief of their truth or were not "studied." Thus the *scienter* necessary for a securities violation was lacking.

(2) Coleco had no valid common-law fraud claim. The *scienter* necessary for a 10b–5 violation is identical with that es-sential for fraud. Since the former was absent, the latter was also lacking.

(3) Coleco was entitled to recover for breach of warranty, but:

(a) no damages were proved for the design defect contention (the court assumed without deciding that the warranty had been breached);

(b) the disputed $80,272 discrepancy was not properly proved;

(c) damages for breach of the warranty of correctness of the April 30 statement were limited to the actual discrepancy between the correct figures and the ones warranted, and recovery on this item was thus limited to $49,922.

(4) Whatever recovery Coleco was entitled to on the breach of warranty was satisfied by the settlement with Zelnick, under the New Jersey "one settlement" rule.

(5) The Royal defendants were entitled to recover the unpaid portion of the $500,000 non-contingent sales price and for the loans they had made to Royal, because the financial discrepancy was not a material breach and because to interpret the purchase agreement as barring recovery would be to read it as a penalty which would be unenforceable. The total amount awarded on this claim was $480,-000.

(6) The Royal defendants were not entitled to recover their share of future profits, since such profits could not be proved with sufficient certainty.

(7) Rubin was entitled to his total remaining $70,506 salary, because he left after his position had been made intolerable by Coleco.

(8) Berman was not entitled to his salary, since his discharge was with cause.

(9) Zelnick was liable to the Royal defendants for the damages awarded on the basis of the breach of financial warranty (in fact, nothing).

(10) Coleco was entitled to only $15,-000 of the claimed $410,550 counsel fees.

With the exception of the design-defect finding and the award of counsel fees,[4] all the parties appealed from the determinations adverse to their contentions. The Royal defendants then moved to dismiss Zelnick's appeal as moot, since under the district court's order, Zelnick has no remaining liability.

We affirm the trial court's decision on issues 1, 2, 3, 4, 5, 6, and 8; remand for recomputation of damages on issue 7; and dismiss the appeal as moot on issue 9.

## II. THE ISSUES

In view of Judge Huyett's extensive opinion, we shall set forth in capsule form the areas of agreement with his holdings.

### A. Securities Fraud

In evaluating the plaintiffs' contentions that the Royal defendants had violated 10b-5, Judge Huyett held that "to establish the element of scienter in an action brought under section 10(b) and Rule 10b-5, a party must prove injury resulting from a conscious deception or from a misrepresentation so recklessly made that the culpability attaching to such reckless conduct closely approaches that which attaches to conscious deception." (423 F.Supp. at 796).

■ The Supreme Court has recently announced, in *Ernst & Ernst v. Hochfelder,* that *"scienter"* is a necessary element of a violation of Rule 10–b(5).[5] We agree with the trial judge, and the majority of the courts which have passed on the question since *Hochfelder,* that plaintiff may recover under Rule 10b–5 for misrepresentations that are recklessly made as well as those made with conscious fraudulent intent.[6] We need not precisely define the nature of the recklessness which might give rise to 10(b)(5) liability, however, for the finding by the trial court that the actions of the Royal defendants were not reckless is amply supported by the record under any of the standards which other courts have suggested.

The trial court specifically determined that the Royal defendants represented to Coleco the condition of Royal as they believed it to be, and that they were "forthright in their dealings with . . . Coleco and did not deliberately misrepresent any aspect of Royal's status or operation."[7] Judge Huyett found as a fact that Rubin "expected Zelnick, Sobelman & Co. to be totally responsible for Royal's accounting, including the costing of the various pool models."[8] He held that the proven errors in the April 30 financial statement could be traced to Zelnick's failure properly to examine the statement, and that the Royal defendants were entitled to recover damages suffered as a result of their reliance on Zelnick in this regard.[9]

Coleco has adduced no evidence which indicates that the reliance on Zelnick's expertise by the Royal defendants was outside the bounds of commercial prudence. Indeed, the only information suggested which might have alerted Royal to inaccuracies was equally available to Coleco.[10] Under

4. Coleco's brief suggests that if damages are recomputed, then attorney's fees should also be re-examined. Since the court does not disturb the final damage award, we need not discuss the contention regarding counsel fees.

5. 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

6. This issue was specifically left open by *Ernst & Ernst v. Hochfelder,* 425 U.S. at 194 n.12, 96 S.Ct. 1375. Cases which have allowed recovery for "reckless" conduct include: *Sunstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033 (7th Cir. 1977); *Sanders v. John Nuveen Co., Inc.,* 554 F.2d 790 (7th Cir. 1977); *Wright v. Heizer Corp.,* 560 F.2d 236 (7th Cir. 1977); *Bailey v. Meister Brau, Inc.,* 535 F.2d 982 (7th

Cir. 1977); *Herzfeld v. Laventhol, Krekstein, Horwath and Horwath,* 540 F.2d 27 (2d Cir. 1976); cf. *Arthur Lipper Corp. v. SEC,* 547 F.2d 171 (2d Cir. 1976) (Friendly, J.) (subjective intent or knowledge not necessary to sustain SEC disciplinary proceeding).

7. 423 F.Supp. at 285, 289.

8. *Id.* at 281.

9. *Id.* at 308–310.

10. In May, 1973, immediately before the sale, an "examining team" from Coleco checked Royal's books, and found that costs had been underestimated by $70 per pool. 423 F.Supp.

these circumstances, we do not believe the trial court erred in finding no "reckless" behavior on the part of the Royal defendants.

### B. Common-Law Fraud and Breach of Warranty

As alternative claims, the plaintiff maintained that it should be able to recover for defendants' misrepresentations on two state law theories: (1) that the representations of profitability and competent design, particularly those contained in the contract, constituted common-law fraud under New Jersey law; and (2) that the failure of the April 30th financial statement and of the pool design to be in accord with the contractual representations of accuracy and soundness, respectively, were breaches of warranty.

The trial court held that no actionable fraud had occurred inasmuch as the standard of *scienter* for common law fraud was identical with that necessary for 10b–5. On the warranty claim, the court found that the admitted $49,922 underestimation of inventory cost in the April 30 statement breached the financial warranty, and it awarded $49,922 as damages. However, it rejected plaintiffs' claim for a recovery of all monies expended in buying and refinancing Royal. Judge Huyett also concluded that, assuming the design defects, if any, breached warranties, no damages had been proven as a result of such breaches.

Plaintiff challenges the failure to find liability on the fraud count as well as the court's calculation of damages on the warranty claim.

### (1) Liability

As a matter of general common law, Judge Huyett's findings of good faith and lack of recklessness negative the assertion of fraud on the part of the Royal defendants. And while common law standards in New Jersey may be read to extend the rubric of fraud beyond the bounds of commercial recklessness,[11] Judge Huyett's failure to recognize such a cause of action is not ultimately at issue here.

■ There is no question but that the falsity of allegedly fraudulent assertions in the April 30 statement also constituted a breach of warranty. As we understand the law of New Jersey, on this record, the damages recoverable for fraud are identical with those recoverable for breach of warranty.[12] A potential finding of fraud is, therefore, superfluous, and the only issue before us regarding the misrepresentations

---

at 286–87. This circumstance differentiates this case from a "face-to-face" transaction with an unsophisticated private investor. The *Scienter* required for a 10b–5 violation in dealing with an experienced buyer who is expected to examine the seller's business thoroughly may well be a more culpable state of mind than that necessary to a violation in public offerings.

11. The discussion of the parties focuses on the doctrine of *Plimpton v. Friedberg*, 110 N.J.L. 427, 166 A. 295 (1933) (misrepresentation put forward as made on basis of personal knowledge is fraudulent, when in fact based on opinion of others). In our judgment, *Zeliff v. Sabbatino*, 15 N.J. 70, 104 A.2d 54 (1954) and *Palmiere v. Forte*, 56 N.J. 155, 265 A.2d 539 (1970), are more apposite.

In *Zeliff* the court upheld a finding of fraud grounded on the defendant realty sellers' misrepresentation, in the contract of sale, regarding the cost of oil used to heat a property. The trial court held, and the Supreme Court affirmed the holding, that "the representation was false, and since defendants stated it as a matter within their own knowledge, it was actionable."

In *Palmiere* the court reversed a finding for the defendants based on a misrepresentation in a stock purchase agreement that a company had an outstanding order for 13,000 units of its produce. Although the sellers' representation was in turn based on a misrepresentation made to them by a company official, and the court described them as innocent, they were held to be liable to the buyers. Apparently, the liability was predicated upon a theory of breach of warranty, rather than fraud, but the court seemed to make no clear distinction, citing *Zeliff* as controlling.

12. *Zeliff, supra,* the leading New Jersey case on damages for fraud announced the following rule: While generally, the plaintiff in a fraud case is entitled to recover "the proximate result of his wrong-doing, if the fraudulent representation also amounts to a warranty, recovery may be had for loss of the bargain, because fraud accompanied by a broken promise should cost the wrongdoer as much as the latter alone." 15 N.J. at 75, 104 A.2d at 56.

is the correctness of the damage calculations.

### (2) Damages

### (a) Proof

■ It is initially necessary to review an evidentiary ruling made by Judge Huyett regarding evidence proffered by the plaintiff on the issue of proof of damages.

In its pretrial memorandum, Coleco indicated that it intended to prove under-costing by comparing the cost sheets prepared for the June, 1973 inventory with cost figures contained in the financial statement for the quarter ending in April, 1973, the financial statement that the defendants had warranted as accurate. The differential came to $80,272.00 more than the $49,922 by which the defendants admitted erring. At the hearing on the plaintiff's summary judgment motion, which occurred before trial, defendants challenged the June, 1973 figures, on the ground that such figures could not be taken to represent the true costs as of the time of the April 30 statement. Defendants maintained that under Royal's first-in-first-out accounting, the proper invoices to examine for costing would have been those for materials bought in 1972, and used in the first quarter of 1973. Since the price of aluminum, the material used to construct the pools, was rising rapidly during 1972–73, defendants argued, costing based on 1973 invoices could be used as neither proof of inaccuracy nor proof of damages.

Without amending their pretrial statement, or notifying defendants' counsel, Coleco thereupon commissioned a Philadelphia accounting firm to study 1972 supply invoices with regard to their similarity to 1973 prices. When Coleco attempted to introduce the findings of the new study by an expert witness, the defendants objected. The trial judge ruled that in light of the failure of plaintiff's pretrial filings to disclose the study or its prospective use, to admit it would subject defendants to unfair surprise and prejudice.

In view of the fact that plaintiff had been specifically ordered to notify counsel and the court of the substance of testimony by witnesses,[13] and that no excuse was presented by Coleco's counsel for its failure to advise the court earlier that the evidence would be offered, we do not believe it was an abuse of discretion to refuse to receive the plaintiff's proffered proof.[14]

---

**13.** Plaintiff argues that since no pretrial order was issued explicitly binding them to reliance on 1973 invoices "in accordance with Local Rule 7(f)," it was error to exclude the evidence. One difficulty with this argument is that Local Rule of Procedure 7(f) of the Eastern District of Pennsylvania became effective in July 1976, while the case was tried during the winter and spring of 1975–76. The prior Rule 7 made no explicit provision for a pretrial order, and indeed contemplated the required pretrial memorandum as having preclusive effect, at least as to witnesses.

More importantly, in August of 1975, the district court issued a pretrial order requiring the plaintiff to file a pretrial memorandum including "plaintiffs' contentions as to disputed facts," and "Plaintiffs' final designation of witnesses to be called at trial . . . briefly identifying each witness and specifying the evidence which the witnesses will give." Given this order, it is not an abuse of discretion to prevent the plaintiffs from introducing a study of 1972 invoices which they neglected to mention before its introduction at trial.

**14.** The sanction chosen by Judge Huyett was a drastic one, and two recent decisions of this

Court have applied relatively strict scrutiny for abuse of discretion in the case of evidentiary exclusions. *Dudley v. S. Jersey Metal, Inc.,* 555 F.2d 96 (3d Cir. 1977) and *Meyers v. Pennypack Woods Home Ownership Assn.,* 559 F.2d 894 (3d Cir. 1977). The crucial factors in the *Dudley* holding, that failure to grant a mistrial with costs taxed to the defendant, was an abuse of discretion were (1) a lack of willfulness on the part of the defendant whose evidence was excluded, and (2) a contributory neglect by the plaintiff.

In *Meyers,* the trial court's refusal to admit testimony of a witness not named in a pretrial memoranda was struck down as an abuse of discretion, on the basis of four factors: "(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to comply with the court's order." (559 F.2d at 904). Here, as in *Meyers,* there was no explicit finding of willfulness or bad faith. Nonethe-

We therefore must accept as correct the trial court's conclusion that costs were underestimated in the April 30th statement by only $49,922.

### (b) Calculation

At trial and before this Court, plaintiff's counsel focused on the contention that the underestimation of costs struck at the heart of the bargain which Coleco had been led to expect; instead of buying a potential gross profit of 36%, plaintiff argues, under the facts as Judge Huyett found them gross profits were closer to 20%. Increased costs and lowered profits, Coleco asserts, meant that Royal was commercially worthless. Therefore, according to Coleco, it is entitled to the full $1.3 million in out-of-pocket expenditures which represents the costs of obtaining and operating Royal.

■ While we recognize that under New Jersey law damages for fraud or breach of warranty seek to compensate a plaintiff for his "loss of the bargain"—the difference between the worth of the article as represented and that as actually delivered [15]—the record does not contain evidence which satisfactorily establishes the worth of Royal either as represented or as delivered. We agree with Judge Huyett's conclusion that the allegation that Royal was worthless is insufficiently supported by the record.[16] Nor can we say that it was error to hold that the plaintiff failed to prove by a preponderance of evidence the degree to which Royal's worth as delivered was less than as represented. Indeed, we find little testimony in the record which bears on such a calculation. The only loss of the bargain actually proven was that which the trial court in fact awarded: the $49,922 by which the April 30 statement overestimated the inventory.

■ Likewise, we do not believe the trial court erred in rejecting Coleco's demand for reimbursement for the out-of-pocket expenditures made on behalf of Royal. Judge Huyett held that Coleco had not proven by a preponderance of the evidence that the misrepresentation of the April 30 statement resulted in the $1.3 million out-of-pocket expenditures. We cannot say that this conclusion was reversible error, particularly in light of the fact that over $600,000 of the amount claimed was expended after Royal learned of the inaccuracies in the April 30 statement.[17]

### (c) The "One Satisfaction" Rule

■ Judge Huyett held that any recoveries due from the Royal defendants to Coleco should be offset by Coleco's $350,000 recovery from Zelnick.[18] That conclusion is not erroneous. The fact that the compensation from Zelnick was obtained on a different theory from that which Coleco asserts against Royal is not controlling under New Jersey law, so long as the damages recovered are the same. Likewise, we believe that the trial court's conclusion that the policy of the New Jersey courts of applying the "one satisfaction" rule only to obtain a "just result," and not on behalf of wrong-

---

less, unlike *Meyers*, no explanation was proffered for the failure to inform defense counsel of the existence of the studies prior to trial. And, in contrast to *Meyers*, the evidence was revealed in the midst of trial rather than three weeks before trial. Finally, proper rebuttal of or impeachment of the accounting study might well have required extensive investigation and preparation. Adjournment of several weeks in the midst of a complex trial which ultimately lasted months is a significant disruption of the trial process.

**15.** *Zeliff v. Sabbatino*, 15 N.J. 70, 75, 104 A.2d 54, 56 (1954). *See* note 12 *supra*.

**16.** Judge Huyett chose not to credit the testimony of Edward Fialkowski, Coleco's treasur-

er, that had Royal's balance sheet showed a deficit, Royal would have had no value. 423 F.Supp. 366 at 52.

We cannot say that Judge Huyett erred in finding that this testimony is unpersuasive. Indeed, the testimony of Coleco's president, Arnold Greenburg, is that even had the costs been underestimated by $100,000 (rather than the $49,922 actually proved), he would still have purchased Royal, albeit at a lower price. (Transcript 250–251).

**17.** *See* Plaintiff's brief pp. 15–25.

**18.** *Breen v. Peck*, 28 N.J. 351, 146 A.2d 665, 671 (1958); *Dailey v. Somberg*, 28 N.J. 372, 146 A.2d 676, 684 (1958).

doers,[19] presents no bar to its use in the present action.

### C. Purchase Price and Loan Repayment Counterclaims, Future Profits

The Royal defendants counterclaimed against Coleco for the balance of the $500,-000 non-contingent purchase price which they had not yet received, as well as for certain sums of money which they had loaned to Royal. Plaintiff asserted as a defense to this counterclaim a clause in the purchase agreement that "obligations of Coleco under the agreement shall at all times be subject to the condition precedent . . . [that] representations and warranties . . . contained . . . shall be true on and as of the closing date." [20]

Judge Huyett construed this condition precedent to apply only to the obligations under the purchase agreement to close the contemplated arrangement, and concluded that if a $49,922 inaccuracy could excuse payment of a $500,000 purchase price after the closing had occurred and Coleco had taken possession of Royal, such a clause would be unenforceable as a penalty.

■ While this ruling may not necessarily be compelled by the record, Judge Huyett's decision is not without substantial evidentiary support. The other paragraphs in the agreement concerning conditions precedent all refer clearly to conditions precedent to closing. In view of the refusal by the New Jersey courts to enforce contractual provisions which act as penalties, Judge Huyett's interpretation will be affirmed.[21]

■ Similarly, the trial court's finding that the breaches of the contract were not so material as to entitle Coleco to retain Royal without tendering the contractual payments is not reversible error. Had Cole-

co attempted to rescind immediately upon learning of the misrepresentations, a different situation might be presented. In view of the fact that Coleco absorbed Royal into its subsidiary, however, we cannot say that Judge Huyett erred in holding that Coleco is required to pay the purchase price set forth in the contract less the damages that it established.

■ We also uphold the trial court's determination that the Royal defendants were not entitled to that portion of the purchase price which was made contingent upon profits. Royal was a fledgling business enterprise, and its future profits were not sufficiently certain so as to be susceptible of accurate determination.

### D. Salary Claims

#### (1) Berman

■ Mr. Berman counterclaims against Coleco for the salary which he was to receive as president of Royal under the purchase and employment agreements. Coleco maintains that the contractual breach was Berman's, and that he was discharged for cause. In view of the evidence that "Berman's office work was a disaster," [22] and that Berman had at one point gone on vacation for several weeks without leave,[23] Judge Huyett's conclusion that Berman was dismissed for cause and therefore had no claim for future salary was neither factually or legally erroneous.

#### (2) Rubin

■ Similarly, we cannot overturn Judge Huyett's conclusions regarding Mr. Rubin. Judge Huyett found that by arranging to move the bulk of Royal's operations out of New Jersey, in violation of a contractual provision, as well as by making

19. *Theobald v. Angelos*, 44 N.J. 228, 208 A.2d 129 (1965).

20. Joint appendix at 231.

21. *See Barr & Sons, Inc. v. Cherry Hill Ctr. Inc.*, 90 N.J.Super. 358, 217 A.2d 631 (1966) (rebate of all rental paid triggered by breach of restrictive covenant); *Westmount Country*

*Club v. Kaceny*, 82 N.J.Super. 200, 197 A.2d 379 (1964); *Feller v. Architects Display Bldg. Inc.*, 54 N.J.Super. 205, 148 A.2d 634 (1959) (unconscionably high interest is penalty).

22. 423 F.Supp. at 314.

23. *Id.*

Rubin's situation as vice-president of Royal untenable, Coleco breached its contract with Rubin. He further found that Rubin's subsequent resignation was a mere acknowledgement of a contractual breach. We do not view these determinations to be erroneous. The New Jersey cases in which resignation has been held to bar an action for breach of an employment contract are factually distinguishable.

At oral argument, counsel for Rubin admitted that his recovery should be reduced by any earnings which Rubin in fact received between the close of trial and the end of the contractual period. We suggested that counsel for Mr. Rubin submit a statement of these earnings to counsel for Coleco, and that the attorneys attempt to reach an agreement on the appropriate set-off. On this issue, the case will be remanded to the district court, and should no agreement eventuate, the district court is directed to offset Mr. Rubin's recovery by the amount which he actually earned through November 1, 1976.

### E. Liability of Zelnick

Since we hold that the district court did not err in its computation of damages, recovery by Coleco against the Royal defendants is offset entirely by the $350,000 settlement between Zelnick and Coleco. Inasmuch as Zelnick is thus exposed to no liability as a result of the judgment against it, Zelnick's appeal becomes moot and must be dismissed.

### III. CONCLUSION

The judgment of the trial court will be affirmed except as it bears on Rubin's wage claim. On the issue of Rubin's wages, the case will be remanded for action in accordance with this opinion.