### In re KULICKE & SOFFA INDUSTRIES, INC. SECURITIES LITIGATION.

**This Document Relates to All Actions.**

No. 86–1656.

United States District Court,
E.D. Pennsylvania.

Oct. 2, 1990.

---

Eugene A. Spector, John F. Innelli, Philadelphia, Pa., for plaintiff.

Jon A. Baughman, Eleanor N. Ewing, Caroline H. West, Karin Z. Engstrom, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

DITTER, District Judge.

Plaintiff Allan Lisse represents a class of shareholders who purchased shares of Kulicke & Soffa Industries, Inc. ("K & S"), common stock between November 8, 1984, and March 11, 1985, inclusive. K & S develops and manufactures equipment, tools, and accessories used in the assembly of semiconductor devices. The company's sales and profitability are directly related to the health of the semiconductor industry. Plaintiff alleged that defendants K & S and Scott Kulicke, the company's chief executive officer and chairman of its board of directors, engaged in securities fraud in violation of federal and state law by failing to retract an optimistic public statement made on October 24, 1984, concerning future sales and earnings and by making false and misleading statements between November of 1984 and March of 1985 to inflate the true value of K & S stock.

Following a seven day trial, the jury was required to respond to special interrogatories, the language and content of which were approved in advance by both parties. N.T. 3/21/90 at 3. The jury's answers to these interrogatories, a copy of which is appended to this opinion, served as the jury's verdict. The jury found that while defendants' October 30, 1984, forecast had become inaccurate or misleading by February 15, 1985, causing the price of K & S common stock to trade at a higher price than it should have, and that while the withheld corrective information was "material" to the marketplace, the defendants did not act or fail to act with an intent to deceive, with reckless indifference, or with negligence. Based on the jury's responses, I entered judgment on all counts in favor of defendants and against plaintiff.

Plaintiff now seeks a judgment notwithstanding the verdict as to the portion of the class period from February 15, 1985, through March 11, 1985, or a new trial with respect to the entire class period. Plaintiff also objects, in part, to defendants' bill of costs. For the reasons that follow, plaintiff's request for judgment notwithstanding the verdict or for a new trial will be

refused; however, I will order defendants to file an amended bill of costs consistent with this opinion.

## I. Motion for Judgment Notwithstanding the Verdict

 Plaintiff contends that the issue before me "is how to resolve the inherent inconsistency in [the jury's] answers and to reach a result that is supported by the evidence." Plf's Mem. at 2. According to plaintiff, "defendants' decision not to correct or retract the forecast by February 15, 1985 *had to be* either intentional or reckless," *id.* (emphasis in original), given the jury's findings that information existed by that date which rendered the forecast inaccurate or misleading. I disagree with plaintiff's characterization of the "issue" before me, and I decline his invitation to inject a presumption of either deceptive intent or reckless indifference into the federal securities laws.

It is well-settled that a motion for judgment notwithstanding the verdict can be granted only when there is but one reasonable conclusion as to the proper judgment, and it is contrary to the verdict. Viewing all the evidence and all the inferences therefrom in a light most favorable to the defendants, I can only overturn the jury's decision where no reasonable factfinder could have reached the result that this jury did. In this case, contrary to plaintiff's contention, there was evidence at trial to support the jury's findings.

Defendants' October 30, 1984, forecast projected sales for K & S in excess of $180 million and earnings per share which exceeded the figures for fiscal year 1984 by over fifty percent.[1] According to Martin Weiss, plaintiff's witness and K & S's chief financial officer until January of 1985, defendants built a $33 million "cushion" into the $180 million sales forecast. N.T. 3/14/90 at 74. Although this sales forecast became increasingly difficult to accomplish as the "cushion" gradually eroded during the first and second quarters of fiscal 1985 from canceled orders, the jury found that projected sales did not become unattainable until February 15, 1985. The "key data sheet"[2] for the week ending February 15, 1985, Plf's Exh. 55, which reflects an inordinate number of canceled orders, supports this finding, and plaintiff does not dispute it. Instead, plaintiff maintains that on February 15, defendants were in possession of information contained in the key data sheet for the week ending that date, and therefore had a duty to inform the public that its October 30 forecast was no longer accurate. *Eisenberg v. Gagnon*, 766 F.2d 770, 776 (3d Cir.1985). Plaintiff argues that the failure to disclose when there is a duty to disclose is *per se* negligent, if not reckless or intentional.[3]

Unfortunately, while plaintiff relies heavily on the Third Circuit's opinion in *Eisenberg* in his post-trial motion, he ignores a critical element of that decision. Defendants cannot be liable under federal securities laws for violating a duty to disclose unless they either *knew* that their forecast was inaccurate and *intentionally* suppressed the truth, or *recklessly* ignored and avoided the truth. *Id.* at 776–78. Similarly, defendants cannot be liable under state law for negligent misrepresentation unless they failed to exercise reasonable care or competence in learning of the inconsistencies in their forecast and communicating such inconsistencies to the public. *Id.* at 778. Hence, it is not enough that defendants were "in possession of" data which

---

**1.** K & S's 1985 fiscal year began on October 1, 1984.

**2.** K & S prepared and distributed internally weekly "key data sheets," Plf's Exhs. 39–55, which contained, in both numerical and graph form, detailed information about the company's actual sales, projected sales, actual shipments, projected shipments, incoming orders, and backlog. N.T. 3/14/90 at 53–60. Defendants used the key data sheets as financial indicators to monitor the company's progress and to pre-

pare budgets and financial reports. N.T. 3/15/90 at 53.

**3.** Because negligent conduct is not actionable under federal securities laws, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), plaintiff contends that at the very least, I should enter judgment notwithstanding the verdict as to his state law claims for negligent misrepresentation.

called a forecast or opinion into question; for defendants to be liable under section 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b), they must have assimilated and comprehended the significance of that information to the forecast and intentionally failed to disclose it, or they must have recklessly avoided assimilating and comprehending the information. State law requires only a failure to assimilate and comprehend where a reasonable man would have done otherwise.

In this case, the jury apparently believed Scott Kulicke's testimony that he would not have received the key data sheet for the week ending February 15, 1985, until February 22, 1985, at the earliest. N.T. 3/15/90 at 112. Kulicke testified that the cancellations reflected in that document were unprecedented, and required investigations by K & S's salespeople to determine the genesis of the cancellations and the effect they would have on the fiscal 1985 budget. *Id.* In addition, there were mistakes in the backlog figures on the key data sheet for that week which Kulicke attempted to correct. N.T. 3/15/90 at 113–114. Kulicke stated that by the first week in March, having obtained the key data sheet for the week ending February 22, 1985, it became clear to him that the company would have to release a public statement recalling its October 30 forecast. This required discussions among the board of directors, consultations with the company's lawyers to determine if and when to retract the forecast and the appropriate language for such a retraction, and drafting and printing of a final version of the press release. N.T. 3/15/90 at 112–113. The press release withdrawing the forecast was disseminated on March 11, 1985, ap-

proximately nine business days after the date Kulicke estimated that he received the key data sheet for the week ending February 15, 1985. The jury accepted Kulicke's testimony that he acted as expeditiously as he could under the circumstances. N.T. 3/5/90 at 113.

A reasonable juror could certainly have concluded that for a large, publicly-held corporation with subsidiaries and customers throughout the world, a nine-day lag between the receipt of negative data and the public dissemination of corrective information was not intentionally deceptive, reckless, or negligent, especially in view of the fact that the company's board of directors was not scheduled to convene during that time period. I simply cannot substitute plaintiff's understanding, aided by hindsight, of the decline in bookings, the cancellation of orders, and the downtown in the semiconductor industry, for defendants' understanding and reaction to these events when it is clearly the defendants' scenario which the jury believed. The Third Circuit has cautioned that the question of what constitutes a "prompt" revision and dissemination is purely one of fact, based upon the particular facts and circumstances of a case. *In re Phillips Petroleum Securities Litigation,* 881 F.2d 1236, 1245–46 (3d Cir.1989). Plaintiff has presented me with no tenable basis to interfere with the jury's interpretation of the evidence, its understanding of the "particular facts and circumstances" of this case, or its credibility determinations.[4]

In addition to the key data sheet for the week ending February 15, 1985, plaintiff focuses on K & S's internal budget revisions dated February 8, February 11, and

---

**4.** Plaintiff overlooks defendants' press release of February 12, 1985, in which Donald VanLuvanee, K & S's president and chief operating officer, acknowledged that orders had been declining since November of 1985 and that, while the company was "still committed" to its aggressive sales target, "we recognize that we are, in part, dependent on our customer's capacity plans, which are being continually re-evaluated." Dft. Exh. 302. Although Van Luvanee's statement did not retract the October 30 forecast, the jury may have viewed it as a partial modification of that forecast, such that the com-

pany's sales goal was qualified after February 12, 1985, by its customers' capacity. A reasonable juror could have concluded that defendants believed that the company's internal budgets, key data sheets, and other indicators supported the contents of the February 12 press release, and that it wasn't until Kulicke received the key data sheet for the week ending February 22, 1985, and reports from the company's salespeople concerning the February 15, 1985, key data sheet, that he realized that the customers' capacity problems and declining demands had made the $180 million sales goal unattainable.

February 12, 1985, Plf's Exhs. 194, 195, 196, each of which contained data on profitability which, after appropriate calculations were made, would have revealed that the "greater than fifty percent" earnings-per-share increase projected in the October 30 forecast was likely unattainable. Kulicke testified that he and the other K & S board members focused almost entirely on revenue as opposed to profitability when discussing the viability of the forecast since profitability could be influenced internally by cutting costs and expenses. So long as sales continued as projected, Kulicke believed that earnings would rise, or could be boosted through cost containment. N.T. 3/19/90 at 77–80; N.T. 3/15/90 at 103–104. Don VanLuvanee, K & S's president and chief operating officer, corroborated Kulicke's testimony. N.T. 3/16/90 at 176. Kulicke further testified that he did not actually make the computations necessary to compare earnings-per-share figures from the February 8, 11, and 12 budget revisions with the earnings-per-share projection contained in the October 30 forecast until he was preparing for trial. N.T. 3/19/90 at 81. The jury was entitled to conclude from Kulicke's admitted preoccupation with the company's sales figures and from his belief that profitability, unlike sales, was somewhat malleable, that he did not intend to deceive the public when he failed to retract the October 30 earnings-per-share forecast before March 11, 1985. Indeed, given the jury's conclusion that defendants did not even act negligently, plaintiff is hard-pressed to prove scienter at this stage.

The jury also found that defendants' failure to change the earnings-per-share forecast was the result of neither reckless indifference nor negligence. Although the evidence supported plaintiff's theory that defendants were more than just a little remiss in overlooking and consequently failing to publicize data reflecting the company's declining profitability, there was also evidence to buttress defendants' contention that the public had already absorbed information from other sources discounting K & S's projected earnings-per-share for fiscal 1985 and that a retraction by K & S would have been merely cumula-

tive. Lawrence Goldstein, a securities analyst and one of plaintiff's expert witnesses, testified on cross-examination that as early as November of 1984 and continuing through February of 1985, several securities analysts, including himself, were publicly discounting K & S's projected earnings-per-share figure for fiscal 1985. Because there is no obligation to correct an opinion or forecast which has already been corrected by other forces in the market, the jury could properly have decided that defendants' failure to disclose the adjusted earnings-per-share data from the revised February budgets immediately was neither reckless nor negligent.

## II. *Motion for a New Trial*

Plaintiff seeks a new trial on the basis that my instruction to the jury on "good faith" "is fundamentally incorrect, constitutes fundamental error, [and] confused the jury." Plf's Mem. at 13. Alternatively, plaintiff contends that a new trial is warranted because the jury's findings were inconsistent with the facts and the law. Neither argument has merit and, accordingly, the motion for a new trial will be refused.

Defendants requested a "good faith" instruction which would inform the jury that if it found that defendants genuinely believed in the accuracy of the October 30, 1984, forecast until it was retracted, defendants could not be held liable under federal securities law, even if the belief was unreasonable. Plaintiff opposed the inclusion of *any* reference to good faith in the jury charge, claiming that defendants' good faith was irrelevant to this case. Unfortunately, both the Supreme Court and the Third Circuit disagree with plaintiff. His argument misconstrues both my instructions to the jury and the relevant case law on good faith. Similarly, his bold characterization of my charge as "fundamentally incorrect" is unsupported by the record and by the legal authority he cites.

In concluding my charge on the element of scienter under section 10(b) of The Securities and Exchange Act and rule 10b–5, I told the jury:

So far as the question of scienter is concerned, the burden rests upon the plaintiff to prove by a preponderance of the evidence that the defendants did not act in good faith. That means the plaintiff cannot recover if the defendants had a genuine belief that the October 30, 1984 forecast remained accurate and complete in all material respects until March 11, 1985, even in light of the events that occurred after the release of the forecast.

That is true even if that belief on their part turns out to have been unreasonable, negligent or an error of judgment.

However, if you conclude that there was either an intentional purpose to deceive the investing public or that the defendants acted recklessly in failing to inform the investing public, the defendants could not have been acting in good faith and under either event scienter would have been established.

N.T. 3/22/90 at 108. Because the burden in a securities fraud case rests upon the plaintiff to prove scienter by a preponderance of the evidence, where the defendant maintains, as Scott Kulicke did, that he acted in good faith, in order to establish intent to deceive, the plaintiff must prove the absence of good faith.[5] "There is no indication that Congress intended anyone to be made liable for [illicit] practices unless he acted other than in good faith." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 206, 96 S.Ct. 1375, 1387, 47 L.Ed.2d 668 (1978); *see* S.Rep. No. 792, 73d Cong., 2d Sess., 23 ("The defendant may escape liability by showing that the statement was made in good faith.") In *McLean v. Alexander*, 599 F.2d 1190, 1198 (3d Cir.1979), the Third Circuit equated scienter with "bad faith," and defined scienter as "lack[ing] a genuine belief that the information disclosed was accurate and complete in all material respects." *Id.* at 1198. The court also reiterated *Hochfelder's* holding that "negligence—whether gross, grave or inexcusable—cannot serve as [a] substitute for scienter." *Id.* The Third Circuit recently confirmed the viability of *McLean* in *In re Phillips Petroleum Securities Litigation*, 881 F.2d 1236 (3d Cir. 1989). It was therefore incumbent upon me to define "good faith" for the jury. My definition was lifted verbatim from *McLean*. If plaintiff is unhappy with this definition, he will have to appeal to a higher authority.

■ Plaintiff is incorrect that I informed the jury that good faith is a defense to negligence. The word "negligence" appeared only once in the good faith instruction. In accordance with *Hochfelder*, I explained to the jury that defendants' genuine belief in the accuracy of a forecast constitutes good faith "even if that belief on their part turns out to have been unreasonable, negligent, or an error of judgment." N.T. 3/22/90 at 108. Nowhere in the instruction did I equate good faith with an absence of negligence. I charged the jury separately on the elements of negligent misrepresentation, and did not mention good faith. These instructions were accurate, complete, and entirely consistent with plaintiff's submissions. N.T. 3/22/90 at 112–117. Nothing less than a distorted reading of my charge leads to the objection plaintiff raises.

■ Plaintiff argues that from my "even mentioning the words 'good faith' to the jury, the jury undoubtedly concluded that if

5. Scott Kulicke testified at trial that he continued to believe in the viability of his October 30 forecast until the decision was made in early March to retract it. He stated that as late as February 12, 1985, he still believed that the company's budgets supported its sales goal. N.T. 3/19/90 at 76. He explained that he believed that the declining book-to-bill ratio the company was experiencing, which reflects a declining ratio of incoming orders to orders shipped, was temporary, and the result of nothing more than an "inventory correction." N.T. 3/19/90 at 68–70. He felt that the company's large backlog would carry it through the "corrective period" without incident. N.T. 3/19/90 at 70. Kulicke maintained that the company "tried to set a standard for candor" which he always intended to meet, N.T. 3/9/90 at 86. He did not believe that any of the statements he made throughout the class period were false and misleading to shareholders, and he never intended to deceive or act with reckless disregard and for the truth with respect to facts disclosed or not disclosed to the public during the class period. N.T. 3/19/90 at 106.

they believed that defendants acted in good faith in general, then it was not important to consider whether defendants intentionally or recklessly failed to withdraw the forecast on February 15, 1985." In the third paragraph of my instruction, I told the members of the jury that if they concluded "that there was either an intentional purpose to deceive the investing public or that the defendants acted recklessly in failing to inform the investing public, the defendants could not have been acting in good faith and under either event, scienter would have been established." N.T. 3/22/90 at 108. I thus made it clear to the jury that "good faith" and "scienter" were mutually exclusive terms so that if scienter were established, by definition, defendants could not have been acting in good faith. I defined good faith *after* I explained to the jury in detail the various ways—from either intentional *or* reckless conduct—that it could infer scienter. N.T. 3/22/90 at 104–108. Nothing in the good faith instruction directed the jury to disregard the element of scienter; rather, the jury was told that good faith was a defense it could consider in determining whether defendants acted with the requisite scienter.

■ Incredibly, plaintiff states the following on page fourteen of his memorandum:

"[D]efendants can not assert that they did not have the requisite scienter because they believed in good faith their forecast, while they had in their possession information indicating that the forecast was in doubt. . . .

[A]n intent 'to deceive the investing public.' . . . is not the standard in a duty to disclose or omission case. To prevail, plaintiff had to prove only that defendant was in possession and aware of material information adversely affecting the forecast, and, with intent, chose not to timely [sic] disclose it."

Plaintiff is simply wrong. The mere possession of adverse information, in and of itself, does not give rise to scienter. The knowledge that information in one's possession renders a prior forecast inaccurate or misleading goes to the heart of the

scienter requirement. *See Coleco Industries, Inc. v. Berman*, 567 F.2d 569, 574 (3d Cir.1977) (approving district court's holding that " 'to establish the element of scienter in an action brought under section 10(b) and Rule 10b–5, a party must prove injury resulting from a conscious deception or from a misrepresentation so recklessly made that the culpability attaching to such reckless conduct closely approaches that which attaches to conscious deception.' ") (quoting *Coleco Industries, Inc. v. Berman*, 423 F.Supp. 275, 296 (E.D.Pa.1976)). As a matter of law and of common sense, one cannot behave with *"conscious* deception" if one possesses or has access to information, but is unaware that the information makes one's actions or omissions deceptive. Contrary to plaintiff's assertion, the scienter element is a *subjective* standard. So long as defendants acted in good faith, *i.e.*, *genuinely* believed in the continued viability of their forecast, absent recklessness, they could not have acted with the requisite scienter, regardless of how *objectively* unreasonable their belief might have been. *In re Phillips*, 881 F.2d at 1244.

Indeed, plaintiff's proposed jury instructions sheds considerable doubt on whether plaintiff, himself, believes in the strength of his objection. At page twenty-six of his proposed instructions, plaintiff requested that I charge the jury as follows:

The second way to establish *scienter* is by showing that defendants acted knowingly and intentionally. In other words, plaintiff can satisfy this element by proving by a preponderance of the credible evidence that the defendants *knew of the material information that was omitted or misrepresented* but nevertheless decided to omit or misrepresent that information *knowing that it would give the public the wrong idea about the true facts.*

(emphasis added). Plaintiff requested and received an instruction which informed the jury that it must find that defendants not only possessed adverse material information, but also *knew* that they possessed it

in order to conclude that defendants acted with intent.

Plaintiff's proposed instruction also discredits plaintiff's assertion that "an intent 'to deceive the investing public'. . . . is not the standard in a duty to disclose or omission case," as does his approval, with minor modifications, of defendants' Request for Jury Instruction No. 15. N.T. 3/21/90 at 24. Defendants' Request No. 15 requires that the jury find that defendants "acted with an intent to deceive or defraud" potential shareholders. My explanation to the jury of the element of scienter, N.T. 3/22/90 at 104–108, was based on plaintiff's submission and on defendants' Request No. 15.

Plaintiff now seeks to challenge the very legal theory he adopted at trial by arguing that to establish scienter, plaintiff need only prove an intent "not to timely [sic] disclose." Plaintiff's novel legal theory is contrary to the Supreme Court's interpretation of section 10(b) of the Securities and Exchange Act of 1934 as articulated in *Hochfelder*, 425 U.S. at 201–214, 96 S.Ct. at 1384–1391, as well as the Court's definition of "scienter," *id.* at 193 n. 12, 96 S.Ct. at 1381 n. 12 ("[T]he term 'scienter' refers to a mental state embracing intent to deceive, manipulate, or defraud.") Not surprisingly, plaintiff cites no legal authority to support his theory that the 1934 Act allows a factfinder to presume scienter where a plaintiff has proved no more than an intent not to disclose.

Plaintiff is not entitled to a new trial on the basis of alleged instructional errors. My charge to the jury on the element of scienter and on the good faith defense was warranted by the evidence, consistent with controlling law, and was easy for the jury to understand.

■ Plaintiff also argues that the jury's findings were contrary to the weight of the evidence, thereby warranting a new trial. He makes reference to K & S's internal budget revisions in November of 1984, January of 1985, and in February of 1985, and to the company's weekly key data sheets, which reflected a declining book-to-bill ratio and an inability to ship product to customers as quickly as anticipated. Plaintiff fails, however, to explain why this evidence entitles him to a new trial. In particular, an inability to fill orders as quickly as they are demanded could easily raise the inference that defendants' sales were *exceeding* their expectations. Although plaintiff clearly has not met his burden of proof, I will briefly explain why the evidence he cites supports the jury's verdict.

Plaintiff's own witness, Martin Weiss, testified that the budget revision on November 8, 1984, was "insignificant." N.T. 3/14/90 at 78. According to Weiss, the revision was the result of the company's temporary manufacturing problems, not a decline in orders, and referred only to the first quarter of fiscal 1985. The budget only reduced expected sales for the year by $4 million. *Id.* Given the $33 million cushion the company had built into its $180 million sales forecast, there was reason for the jury to conclude that the budget revision did not warrant any correction to the October 30 forecast.

Although Weiss testified that he began to feel "uncomfortable" with the October 30 forecast, N.T. 3/14/90, at 82; N.T. 3/15/90 at 17, he could not refer to any indicators, other than his own "feelings," which rendered the projected sales unattainable. N.T. 3/14/90 at 82; N.T. 3/15/90 at 31. In early January of 1985, the company revised the projected revenues for the second quarter of fiscal 1985 from approximately $51 million to $45.5 million. N.T. 3/15/90 at 41. Again, according to Weiss, the budget revision was due to the company's problems meeting the demands for its product, not industry stagnation or canceled orders. N.T. 3/15/90 at 43. As of January 22, 1985, when Weiss memorialized the company's second quarter budget in a memorandum to Scott Kulicke, N.T. 3/15/90 at 44; Dfts' Exh. 103, K & S's anticipated sales for fiscal 1985 were $203 million, $23 million *beyond* the sales projected in the October 30 forecast. N.T. 3/15/90 at 49.

As discussed earlier, the key data sheets for the weeks from October 30, 1984, through February 8, 1985, Plf's Exhs. 33–

54, reflect that $180 million in sales remained an attainable goal, although revenues were steadily declining. While profits were accordingly lower than expected, Kulicke maintained that earnings could be increased through cost cutting. N.T. 3/19/90 at 77–80. According to Kulicke, it was not until he had investigated the basis for the rash of canceled orders contained in the February 15, 1985, key data sheet, which he claimed he did not receive until at least February 22, 1985, that he realized that the October 30 forecast was no longer realistic. N.T. 3/15/90 at 112. There was thus sufficient evidence that he did not have knowledge that the forecast was unreasonable until at least February 22, 1985. The jury was justified in concluding that Kulicke acted as promptly as he could, after discussing the matter with various directors and the company's attorneys, in releasing a public statement retracting the forecast nine working days after he received the February 15, 1985, key data sheet.

From Van Luvanee's qualification in the February 12, 1985, press release that the company's sales target for the year was "in part, dependent on our customer's capacity plans," Dfts' Exh. 302, the jury could properly have decided that defendants did not act with either scienter or negligence in waiting until March 11, 1985, to withdraw the forecast completely. The jury's verdict was supported by the evidence; therefore, plaintiff is not entitled to a new trial.

### III. Plaintiff's Supplemental Motion for a New Trial

■ Approximately seven weeks after plaintiff filed his motion for judgment notwithstanding the verdict or for a new trial, he supplemented his request for a new trial on the basis of possible juror misconduct. I conclude that plaintiff's supplemental motion does not warrant a new trial. It will therefore be refused.

On May 16, 1990, approximately two months after the trial had concluded, counsel for plaintiff, Eugene Spector, wrote to inform me that he had recently discovered that the jury foreman in this case, Lynn

Pompa, was the same individual against whom he had asserted a claim on behalf of his wife in January of 1990. See Plf's Suppl. Motion at Exh. D. Patrice Pompa, the wife of the jury foreman, apparently had been involved in a minor car accident with Barbara Spector, the wife of Eugene Spector, on January 2, 1990. According to Mr. Spector, his wife's car cost $300 to repair. No one was injured in the accident. Mr. Spector wrote Mrs. Pompa a brief letter on his firm stationery on January 8, 1990, inquiring as to whether she wanted to turn the claim over to her insurance carrier or to handle it herself. Mr. Spector stated that a man who identified himself as "Mr. Pompa" called him soon thereafter to inform him that he had referred the matter to his insurance company. This was the extent of the communication between Mr. Spector and Mr. Pompa.

Mr. Spector did not recognize Mr. Pompa during voir dire or at trial as the man with whom he had communicated in January. It was not until Mr. Spector came across a letter in his desk from Mr. Pompa's insurance carrier that he realized that the insured was the man who served as jury foreman.

The voir dire in this case was not recorded. I conducted the voir dire orally by making a series of statements concerning the case and by asking the members of the venire a list of questions which I had prepared on the basis of requests submitted by plaintiff and defendants. The venire persons were instructed to raise a hand if a particular question required an affirmative answer.

I first introduced the attorneys in the case to the venire by name. Mr. Spector was present for this introduction and for the entire voir dire. I then asked the venire whether any of them knew any of the persons to whom I had referred. I recall that Mr. Pompa did not answer affirmatively. Had he done so, I would have questioned him further and my notes would have reflected this fact. I also asked the venire whether anyone had ever asserted a claim against any one of them or a member of one of their families. I recall that Mr.

Pompa stated that he and his wife had been involved in "litigation" concerning an automobile accident. Mr. Pompa then stated that the incident was handled out of court. My recollection is consistent with that of John Innelli, counsel for plaintiff. *See* Aff. of John Innelli, attached as Exh. D to Plf's Suppl. Motion. I then asked each venire person whether the experience he may have had when someone asserted a claim for money damages against him or a family member would influence his behavior in this case in any way. Mr. Pompa did not answer affirmatively. Lastly, I informed each venire person that if he were selected as a juror, he would be told that he could not try the case "on the basis of sympathy or prejudice for either side." I asked the venire whether there was anyone "who would be unwilling or unable to follow an instruction of that type." Again, Mr. Pompa did not come forward.

Plaintiff requested an "investigatory hearing." Instead, on September 28, 1990, I conducted an evidentiary inquiry via telephone conference call among Mr. Spector, Eleanor Ewing (counsel for defendants), and Mr. Pompa. The conference call was recorded. I told Mr. Pompa that he should consider himself to be sworn and under oath. I then asked him a series of questions. In response to these questions, Mr. Pompa confirmed that he had no recollection of any connection with Mr. Spector at any time during the questioning of the venire, during counsels' opening addresses, during the presentation of evidence, during counsels' closing arguments, during the jury charge, during the jury deliberations, or during the announcement of the jury verdict. N.T. 9/28/90 at 5–7. Mr. Pompa stated that he first realized this past summer, over two months after the trial had concluded, that counsel for plaintiff was the man who had asserted the claim against his wife when he found a cancelled check bearing Mr. Spector's name. According to Mr. Pompa, the automobile accident to which he was referring in response

to my inquiry during voir dire was *not* the accident involving Mrs. Spector, but a different accident which occurred several years ago and which was settled out of court.

Mr. Pompa clearly did not harbor any ill-will towards Mr. Spector or his client during any stage of the trial. There is no reason to doubt Mr. Pompa's credibility. His responses during voir dire were consistent with his recollection of events at that time.[6] There is simply no evidence or indication that he concealed information from me during voir dire, at trial, or during our conference call. Plaintiff has not met his initial burden of demonstrating that Mr. Pompa failed to answer honestly a question on voir dire. *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 556, 104 S.Ct. 845, 850, 78 L.Ed.2d 663 (1984). Thus, plaintiff's supplemental motion for a new trial must be refused.

## IV. *Defendants' Bill of Costs*

Defendants submitted a bill of costs and a memorandum and affidavit in support thereof seeking reimbursement for the cost of daily copy of the trial transcript, for the cost of deposition transcripts, some of which were expedited, for the cost of demonstrative exhibits, copy fees, and witness fees. Plaintiff filed a response objecting to the cost of the trial transcript and the cost of deposition transcripts of individuals who did not testify at trial.

 Rule 54(d) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1920 provide for recovery of fees for transcripts, exemplification, and other papers which were "necessarily obtained" for use in the case. Here, I find that while daily copy of trial transcripts was certainly a convenience to defendants, it was not "necessarily obtained" for either the presentation of their case or for effective cross-examination of plaintiff's witnesses. Contrary to plaintiff's assertion, defendants would have been severely handicapped in responding to

---

**6.** Although there were some minor differences between Mr. Pompa's answers during the conference call and Mr. Spector's version of the facts concerning the amount of money Mrs.

Spector received and whether the matter was submitted to Mr. Pompa's insurance carrier for payment, this is no basis for discrediting the remainder of Mr. Pompa's testimony.

plaintiff's post trial motions had they not obtained the trial transcripts. I will therefore allow the cost of non-expedited trial transcripts to be taxed against plaintiff.

■ Similarly, defendants required copies of deposition transcripts to respond to plaintiff's pretrial motions and to prepare for trial. Defendants will not be limited to recovery of costs for the deposition transcripts of individuals who testified at trial since effective trial preparation and the ability to respond adequately to plaintiff's pretrial motions depended in large part on the review of deposition testimony. *Posner v. Lankenau Hospital,* 1990 WL 18250, 1990 U.S. Dist. Lexis 2047 (E.D.Pa. Feb. 26, 1990). Also, in several instances, the decision not to call a previously deposed individual as a witness at trial was that of plaintiff, not defendants. I will disallow the additional fee for expedited deposition testimony, however, as I find that expedited copy was not "necessarily obtained" for use in preparing for and trying this case.

■ Plaintiff has not objected to defendants taxing of costs for copying and for demonstrative exhibits. Costs for copying and exemplification are recoverable pursuant to 28 U.S.C. § 1920(4). Defendants used all of the demonstrative exhibits for which it seeks remuneration at trial. These exhibits were helpful to the jury and to me and were utilized frequently during the testimony of defendants' expert, Mr. Fischel. The costs for the demonstrative exhibits and for copying are reasonable. I will allow both.

■ Plaintiff also does not object to defendants' taxation of costs for their witnesses attendance allowance, travel, hotel and meal expenses in accordance with 28 U.S.C. §§ 1920, 1821 and 5 U.S.C. § 5702(a). Taxation of these costs is appropriate, within reason; however, I cannot ascertain why two round-trip airline tickets between Philadelphia and Chicago cost almost $2,000. Section 1821(c)(1) of Title 28 states that "a witness shall utilize a common carrier at the most economical rate reasonably available." Defendants will provide me with a further explanation why $1,000 for round-trip travel between Philadelphia and Chicago was "the most economical rate reasonably available," or I will disallow this cost.

Defendants shall submit an amended bill of costs and an affidavit in support thereof in accordance with 28 U.S.C. § 1924 within ten days.

## V. *Conclusion*

Plaintiff's motion for a judgment notwithstanding the verdict or, alternatively, for a new trial will be refused. His supplemental motion for a new trial will also be refused. Plaintiff's objections to defendants' bill of costs will be granted in part and refused in part.

## APPENDIX

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**